[No. B065917. Second Dist., Div. Two. Aug. 23, 1994.]

JEAN R. KERINS, Plaintiff and Appellant, v.
MARY KATHLEEN HARTLEY, as Special Administratrix, etc., et al.,
Defendants and Respondents.

---

## COUNSEL

Alvin L. Pittman for Plaintiff and Appellant.

Kirtland & Packard, Harold J. Hunter, Jr., Hagenbaugh & Murphy, David F. Berry, Raymond R. Moore, Greines, Martin, Stein & Richland, Irving H. Greines and Barbara W. Ravitz for Defendants and Respondents.

Catherine I. Hanson, Alice P. Mead, Jon W. Davidson, Peter V. Lee, Wallin, Kress, Reisman, Price & Pettit, Stanton J. Price, Munger, Tolles & Olson and Allen M. Katz as Amici Curiae on behalf of Defendants and Respondents.

---

## OPINION

**FUKUTO, J.—**

### Introduction

In a lawsuit filed against defendants and respondents, James S. Gordon, M.D., and his partners in medical practice, Marki J. Knox, M.D., Karen Blanchard, M.D., and Associates, Inc., and the Women's Medical Group of Santa Monica, a California general partnership, plaintiff and appellant, Jean R. Kerins, sought general and punitive damages, including health care expenses, lost past and future earnings, and compensation for severe mental anguish and emotional distress, which she allegedly suffered upon discovering that Dr. Gordon performed surgery upon her to remove a large uterine fibroid tumor at a time when he was infected with human immunodeficiency virus (HIV). Ms. Kerins appealed from the trial court's order granting summary judgment in favor of respondents, who now include the special administratrix of the estate of James Gordon, substituted as a party defendant and respondent following Dr. Gordon's death due to acquired immune deficiency syndrome (AIDS) on July 11, 1990.

This court reversed the judgment. Without the benefit of the Supreme Court's decision in *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th

965 [25 Cal.Rptr.2d 550, 863 P.2d 795] (hereafter *Potter*), we rejected the approach of several other jurisdictions which consider emotional distress damages due to fear of AIDS legally noncompensable unless the plaintiff alleges and proves actual exposure, and it is more probable than not that the plaintiff will actually develop the disease.[1] We took the approach utilized in *Faya* v. *Almaraz* (1993) 329 Md. 435 [620 A.2d 327], which allows recovery of emotional distress damages due to the fear of developing AIDS for the reasonable window of anxiety—the period between which the plaintiff learns of the health care worker's or surgeon's HIV seropositivity, and receives fear-relieving information, such as proof of nonexposure, or HIV-negative test results. We also held that a legally cognizable cause of action for battery was established by appellant's assertion that her consent to surgery was conditioned upon the surgeon's good health, and Dr. Gordon intentionally violated the "good health" condition of her consent by performing an invasive surgical procedure without disclosing his HIV-positive status, and the possible onset of symptoms of AIDS.

The Supreme Court granted respondents' petition for review, then transferred the matter to this court "with directions to vacate its decision and to reconsider the cause in light of *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795]." Upon reconsideration, we affirm summary judgment in favor of respondents.

## The Facts

The few undisputed facts established by the parties' pleadings include the following. In June 1986, appellant was experiencing severe abdominal pain. She consulted Dr. Gordon, one of the physicians of Women's Medical Group of Santa Monica (WMG), about the problem. Dr. Gordon's diagnosis of a probable fibroid tumor was confirmed by ultrasound. After a conservative approach to treatment proved ineffective, and the tumor continued to grow, appellant was advised to undergo surgery.

On November 5, 1986, Dr. Gordon performed surgery on appellant, consisting of an exploratory laparotomy, lysis of peritoneal adhesions, multiple myomectomies, uterine reconstruction, and repair of the broad ligament. The detailed operative report of the surgery does not indicate that any cuts were sustained by Dr. Gordon, or that there were any other unusual occurrences during the lengthy surgery.

---

[1]See, e.g., *Burk* v. *Sage Products, Inc.* (E.D.Pa. 1990) 747 F.Supp. 285; *Lubowitz* v. *Albert Einstein Medical Center* (1993) 424 Pa.Super. 468 [623 A.2d 3]; *Funeral Services by Gregory, Inc.* v. *Bluefield Community Hospital* (1991) 186 W.Va. 424 [413 S.E.2d 79]; *Doe* v. *Doe* (1987) 136 Misc.2d 1015 [519 N.Y.S.2d 595].

On November 10, 1986, Dr. Gordon received the results of T-cell panel blood tests administered on dates uncertain between November 3 and 6, 1986. The tests indicated that Dr. Gordon was infected with HIV, the probable causative agent of AIDS. Shortly thereafter, Dr. Gordon informed the other respondents of his test results, but continued actively practicing medicine with WMG.

At a disputed point in time, Dr. Gordon developed AIDS. On April 21, 1988, he announced his illness on a televised news broadcast seen by appellant. The announcement was broadcast in the context of a news story about an AIDS discrimination lawsuit filed by Dr. Gordon against the other respondents, who had refused to permit him to return to his surgical practice upon recovering from an AIDS-related illness. The televised broadcast also featured statements by Dr. Gordon's partners, Drs. Knox and Blanchard, commenting on the frequency with which surgeons cut or poked themselves with knives or needles during surgical procedures, criticizing Dr. Gordon's refusal to obtain informed consent for surgery by advising patients of his illness, and explaining that their patients must be protected from even the remote risk of exposure to AIDS.

Within a day of the news broadcast, appellant underwent a test for HIV. Approximately two weeks later, she received test results negative for the presence of HIV antibodies.

It was undisputed that using testing methods available in April 1988, 95 percent of HIV-infected individuals tested positive for HIV antibodies within six months of the date of transmission.[2]

At all times relevant to the instant lawsuit, AIDS was known to be fatal in 100 percent of cases and had no known cure.

Dr. Gordon denied, under oath, that he cut or poked himself during appellant's surgery. Appellant admits that she can offer no evidence to the contrary. The statistical data considered by the trial court establishes only a

---

[2]More accurate tests are presently available. Appellant's own expert, Dr. William T. O'Connor, testified that the accuracy of currently available HIV antibody testing methods is 99.8 percent. However, appellant has refused to be retested because of her professed inability to endure the emotional trauma associated with testing, and the fact that even using current testing methods, negative results will not rule out with 100 percent certainty the admittedly remote possibility that she has been infected.

miniscule risk of percutaneous injury and HIV transmission from doctor to patient during surgery.[3]

Little else about the case is undisputed. Dr. Gordon and his colleagues denied having actual knowledge of Dr. Gordon's HIV-positive status until after November 10, 1986. Dr. Gordon admitted in discovery that he knew he was in a high risk group for AIDS, and entries in his medical records showed that he frequently sought medical attention in late 1985 through 1986 for a variety of ordinarily common ailments including colds, flu, and a skin rash.

Appellant's pleadings and supporting declarations aver that she went to Dr. Gordon and WMG because she knew of their commitment to patient-involved decisionmaking and informed consent. She expressed particular concern to Dr. Gordon about the danger of contracting AIDS from blood transfusions and was advised to and did store some of her own blood in case the need for transfusion of blood arose during surgery. According to appellant, in a presurgery interview, she specifically asked Dr. Gordon, " 'How is your health?' " Dr. Gordon advised her that he went to a gym regularly and jogged every morning. He did not mention the possibility that he was infected with HIV or AIDS.

Respondents and Dr. Gordon denied having discussions with appellant in which she expressed fear of contracting AIDS from blood transfusions or directly asked about Dr. Gordon's health.

The magnitude and reasonableness of appellant's claimed emotional distress due to her unabated fear of developing AIDS despite negative HIV test results was also contested by respondents. Based on data from scientific

---

[3]The July 12, 1991, issue of CDC Morbidity and Mortality Weekly Report, a publication of the United States Department of Health and Human Services Center for Disease Control (CDC), estimates that the theoretical risk of percutaneous injury of surgical personnel is approximately 6.9 percent. (*Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures* (1991) 40 CDC Morbidity and Mortality Weekly Rep. 1, 4 [hereafter *CDC Recommendations*].) The theoretical risk of HIV transmission from health care worker to patient after such percutaneous exposure is estimated to be only 0.3 percent. (*Id.* at p. 3.) Using these figures, respondents calculate that the hypothetical odds of a patient acquiring AIDS from an infected surgeon is one in fifteen thousand. Assuming the probability of seroconversion following a negative HIV antibody test administered in 1988 is no more than one in twenty (5 percent)—a fact conceded by appellant—respondents conservatively estimate that appellant's risk of developing AIDS is at most one in three hundred thousand. Using more recent HIV transmission statistics, and assuming appellant tested negatively using current, more accurate HIV antibody testing methods, respondents postulate that the appellant's overall risk of developing AIDS is infinitesimal—only one in twenty-four million.

articles and journals,[4] respondents asserted in their statement of undisputed material facts that the risk of HIV transmission with actual percutaneous exposure to the blood of an HIV-infected individual is approximately 0.3 percent; that there were no known instances of a medical doctor transmitting the HIV virus to a patient; and that in a study of a total of 4,703 patients of HIV-positive surgeons, there were no documented cases of HIV transmission from infected surgeon to patient.

Appellant did not dispute the existence of such studies; rather, she disputed their relevance. She argued the genuineness and objective reasonableness of her fear of developing AIDS based on the July 12, 1991, issue of the CDC Morbidity and Mortality Weekly Report, *supra*. (*CDC Recommendations, supra*.) The report documented one known case of an infected dentist transmitting AIDS to five patients, and concluded, inter alia, that investigations documenting a low risk of HIV or AIDS transmission from infected health care worker to patient were inconclusive because a "precise estimate of the risk of HIV transmission from infected [health care workers] to patients can be determined only after careful evaluation of a substantially larger number of patients whose exposure-prone procedures have been performed by HIV-infected [health care workers]." (*CDC Recommendations, supra*, at p 4.)

The CDC's July 1991 report also made recommendations for prevention of transmission of HIV by health care workers including, but not limited to, the following: "[Health care workers] who are infected with HIV . . . should not perform exposure-prone procedures unless they have sought counsel from an expert review panel and been advised under what circumstances, if any, they may continue to perform these procedures. Such circumstances would include notifying prospective patients of the [health care worker's] seropositivity before they undergo exposure-prone invasive procedures. [Fn. omitted.]" (*CDC Recommendations, supra*, at p. 5.) Exposure-prone invasive procedures were defined to include "digital palpation of a needle tip in a body cavity or the simultaneous presence of the [health care worker's] fingers and a needle or other sharp instrument or object in a poorly

---

[4]The following articles were appended as exhibits to the motion for summary judgment: Horsburgh et al., *Duration of Human Immunodeficiency Virus Infection Before Detection of Antibody* (1989) The Lancet 637; Henderson et al., *Risk for Occupational Transmission of Human Immunodeficiency Virus Type I (HIV-I) Associated with Clinical Exposures* (1990) 113 Annals of Internal Med. 740; Sacks, *AIDS in a Surgeon* (1985) 313 New Eng. J. Med. 1017; Mishu et al., *A Surgeon with AIDS: Lack of Evidence of Transmission to Patients* (1990) 264 JAMA 467; Armstrong et al., *Investigation of a Health Care Worker with Symptomatic Human Immunodeficiency Virus Infection: An Epidemiological Approach* (1987) 152 Mil. Med. 414; and Porter et al., *Management of Patients Treated by Surgeon with HIV Infection* (1990) The Lancet 113.

visualized or highly confined anatomic site." (*CDC Recommendations, supra*, at p. 4.) "Obstetric/gynecological" procedures such as those performed by Dr. Gordon on appellant were classified as "exposure-prone" under 1991 CDC guidelines. (Gostin, *CDC Guidelines on HIV or HBV-Positive Health Care Professionals Performing Exposure-Prone Invasive Procedures* (1991) 19 Law, Medicine & Health Care 140.)[5]

To show the reasonableness of her fear of developing AIDS, appellant also offered excerpts from the deposition testimony of William T. O'Connor, M.D. According to Dr. O'Connor, certain persons will continue to test negative for HIV antibodies for prolonged periods of time after exposure even though they have been infected with the virus; therefore, even if appellant's test results were negative for the next 25 years, she could not be 100 percent certain that Dr. Gordon did not infect her on November 5, 1986.

Following a lengthy hearing, the trial court granted respondents' motion for summary judgment. We review the trial court's ruling considering the limitations on liability for emotional distress damages established by our Supreme Court in the "fear of cancer" context. (See *Potter, supra,* 6 Cal.4th at pp. 981-1004.)

*Recoverability of Emotional Distress Damages for Fear of AIDS*

▆▆▆ Relying on *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], which limits the scope of bystander recovery for emotional distress, the trial court found that appellant's fear of developing AIDS was unreasonable as a matter of law given the miniscule risk of HIV transmission with actual percutaneous exposure during surgery (0.3 percent), appellant's 95 percent accurate negative HIV test results, and the lack of evidence to controvert Dr. Gordon's sworn testimony that actual exposure did not occur.

During the pendency of this appeal, the Supreme Court filed its decision in *Potter,* which addresses a closely related issue: whether emotional distress damages engendered by a fear of developing cancer or other illness as a result of toxic exposure is a recoverable item of damages. Certain bright line rules are derived from the discussion in *Potter,* dispositive of the outcome of this case.

---

[5]Congress subsequently passed legislation directing state health officials to certify that the states had promulgated guidelines, consistent with federal law, for the prevention of HIV transmission during exposure-prone procedures. (Pub.L. No. 102-141 (Oct. 28, 1991) 1991 U.S. Code Cong. & Admin. News, pp. 876-877, § 633.)

## Legal Duty

In *Potter*, the Supreme Court reaffirmed the lack of an independent tort of negligent infliction of emotional distress in California. ██ Unless a defendant assumes a duty to the plaintiff in which the emotional condition of the plaintiff is the object, recovery for negligent infliction of emotional distress is ordinarily available only if the defendant breaches some other legal duty which threatens physical injury, and the emotional distress is proximately caused by that breach of duty. (*Potter, supra*, 6 Cal.4th at pp. 984-985.) The Supreme Court found that defendant Firestone had a duty to any person who might foreseeably come in contact with its hazardous waste to use care, and comply with government regulations governing the manner and location of waste disposal. (*Id.* at p. 986.) Firestone breached a legal duty to the plaintiffs by depositing toxic waste in a class II sanitary landfill in violation of law.

██ In the instant matter, Dr. Gordon had an analogous duty to any patient who might foreseeably come in contact with his blood during surgery to use due care, and comply with current CDC guidelines governing performance of exposure-prone obstetric/gynecological procedures. It is not claimed that Dr. Gordon did not use due care in the performance of the surgical procedure itself. At the time of the surgery, CDC guidelines emphasized universal barrier precautions as the best means of preventing HIV transmission from infected health care worker to patient. An infected surgeon was permitted to continue engaging in professional practice, including the performance of invasive surgical procedures, so long as appropriate barrier precautions were used. Mandatory HIV/AIDS screening of health care workers performing invasive procedures was not required. Furthermore, 1986 CDC guidelines did not require notification to prospective patients of a health care worker's known seropositivity. (Barnes et al., *The HIV-Infected Health Care Professional: Employment Policies and Public Health* (1990) 18:4 Law, Medicine & Health Care 311.) Dr. Gordon did not violate 1986 CDC guidelines by performing appellant's surgery, or by failing to disclose his HIV seropositivity to her.

For purposes of analyzing respondents' liability for negligent infliction of emotional distress, it is therefore questionable whether appellant's emotional suffering was proximately caused by the breach of any legal duty owed to her by Dr. Gordon. Assuming for the very limited purpose of argument that an independent duty of disclosure was created by appellant's specific inquiries about the state of Dr. Gordon's health, appellant's claim for negligently inflicted emotional distress damages nevertheless falls under *Potter*.

### The "More Likely Than Not" Standard

For reasons observed more than a decade ago in *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 925-929 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518], the Supreme Court refused in *Potter* to adopt a hard-and-fast rule barring recovery for negligently inflicted emotional distress damages due to the fear of developing cancer without proof by the plaintiff of a present physical injury or a clinically verifiable serious condition. (*Potter, supra,* 6 Cal.4th at pp. 997-998.) The high court did, however, impose clear-cut limitations on the recoverability of such damages. ■ "[I]n the absence of a present physical injury or illness, damages for fear of cancer may be recovered only if the plaintiff pleads and proves that (1) as a result of the defendant's negligent breach of a duty owed to the plaintiff, the plaintiff is exposed to a toxic substance which threatens cancer; *and* (2) the plaintiff's fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is more likely than not that the plaintiff will develop the cancer in the future due to the toxic exposure." (*Id.* at p. 997.) The high court adopted the "more likely than not" threshold in recognition of several public policy concerns.

First, the court observed that all of us are "aware of and worried about the possibility of developing cancer from exposure to or ingestion of a carcinogenic substance." (*Potter, supra,* 6 Cal.4th at p. 991.) Accordingly, "[p]roliferation of fear of cancer claims in California in the absence of meaningful restrictions might compromise the availability and affordability of liability insurance for toxic liability risks." (*Ibid.*)

A second policy concern was the unduly detrimental impact that unrestricted fear liability would have in the health care field. For example, new information about the potentially harmful effects of currently prescribed beneficial prescription drugs often takes years to develop. Unless meaningful restrictions are placed on the potential class of patients who are presently healthy but who nonetheless fear the risk of developing adverse effects from prescription drugs, the threat of litigation, plus the added cost of insurance could diminish the availability of new prescription drugs, or render them unaffordable. (*Potter, supra,* 6 Cal.4th at pp. 991-992.)

The Supreme Court also considered the possible detriment to those persons exposed to toxic substances who sustain physical injury or who ultimately develop cancer if all persons fearing cancer are afforded an unrestricted right of recovery. Concern was voiced that defendants and their insurers would be unable to ensure adequate compensation for victims " 'suffering of permanent and serious physical injuries.' [Citation.]" (*Potter, supra,* 6 Cal.4th at p. 993.)

The fourth reason given for imposing a "more likely than not" limitation is the need to promote early resolution or settlement of fear of cancer claims by establishing a "sufficiently definite and predictable threshold for recovery to permit consistent application from case to case." (*Potter, supra,* 6 Cal.4th at p. 993.) Without such a threshold, there would be the likelihood that juries would "differ over the point at which a plaintiff's fear [of developing cancer] is a genuine and reasonable fear." (*Ibid.*)

 All of the policy concerns expressed in *Potter* apply with equal force in the fear of AIDS context. The magnitude of the potential class of plaintiffs seeking emotional distress damages for negligent exposure to HIV or AIDS cannot be overstated. As another division of this court recently observed, "[t]he devastating effects of AIDS and the widespread fear of contamination at home, work, school, healthcare facilities and elsewhere are, sadly, too well known to require further discussion at this point." (*Herbert* v. *Regents of University of California* (1994) 26 Cal.App.4th 782, 788 [31 Cal.Rptr.2d 709].) Proliferation of fear of AIDS claims in the absence of meaningful restrictions would run an equal risk of compromising the availability and affordability of medical, dental and malpractice insurance, medical and dental care, prescription drugs, and blood products. Juries deliberating in fear of AIDS lawsuits would be just as likely to reach inconsistent results, discouraging early resolution or settlement of such claims. Last but not least, the coffers of defendants and their insurers would risk being emptied to pay for the emotional suffering of the many plaintiffs uninfected by exposure to HIV or AIDS, possibly leaving inadequate compensation for plaintiffs to whom the fatal AIDS virus was actually transmitted.

*Potter* demands application of the "more likely than not" threshold to emotional distress claims arising out of negligent exposure to HIV or AIDS. Accordingly, in the absence of physical injury or illness, damages for fear of AIDS may be recovered only if the plaintiff is exposed to HIV or AIDS as a result of the defendant's negligent breach of a duty owed to the plaintiff, and the plaintiff's fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is more likely than not he or she will become HIV seropositive and develop AIDS due to the exposure. At the time summary judgment was granted in this case, there remained only the most speculative possibility that appellant would actually develop AIDS at some point in the future. According to *Potter*, no recovery for negligent infliction of emotional distress is permitted.

### Exception for Oppressive, Fraudulent or Malicious Conduct

 *Potter* established an exception to the "more likely than not" threshold for fear of cancer recovery in a negligence action where the plaintiff

pleads and proves that the defendant's conduct in causing the exposure amounts to "oppression, fraud, or malice" as defined in Civil Code section 3294, which authorizes the imposition of punitive damages. (*Potter, supra,* 6 Cal.4th at p. 998.) More is required, however, than mere proof that the defendant has acted with oppression, fraud or malice. To recover for emotional distress, the plaintiff must demonstrate that his or her fear of cancer is "reasonable, genuine and serious" (*id.* at p. 999), and the fear of cancer must stem from a knowledge, corroborated by reliable medical or scientific opinion, that the toxic exposure caused by the defendant's breach of duty has "significantly increased the plaintiff's risk of cancer *and* has resulted in an actual risk of cancer that is significant." (*Id.* at p. 1000.)

Civil Code section 3294, subdivision (c)(3) defines "fraud" as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." █ Appellant's third cause of action for intentional misrepresentation charges Dr. Gordon and his colleagues with intentionally concealing and misrepresenting appellant's foreseeable risk of contracting AIDS during surgery so as to secure her business as a patient. Regardless of whether appellant can prove the fraud alleged, recovery for emotional distress damages is precluded because the actual risk that appellant will develop AIDS is statistically insignificant.

### *Intentional Infliction of Emotional Distress*

█ In *Potter,* the Supreme Court also considered whether Firestone could be held liable for intentional infliction of emotional distress for contaminating the plaintiffs' drinking water with carcinogenic chemicals. The court concluded that recovery of fear of cancer damages in actions for intentional infliction of emotional distress did *not* depend on a showing of a medically corroborated belief that it is more likely than not that the plaintiff will develop the feared cancer as a result of the toxic exposure. (*Potter, supra,* 6 Cal.4th at p. 1003.) It must be shown, however, that the plaintiff's fear of cancer is reasonable—i.e., "based upon medically or scientifically corroborated knowledge that the defendant's conduct has significantly increased the plaintiff's risk of cancer and that the plaintiff's actual risk of the threatened cancer is significant." (*Id.* at p. 1004.)

The record clearly establishes that there is no "significant" risk that appellant will in the future develop AIDS as the result of exposure to HIV during the surgery performed by Dr. Gordon. This makes appellant's fear of AIDS unreasonable as a matter of law. Therefore, whether or not respondents' conduct toward appellant was so extreme and outrageous that it

exceeded all bounds usually tolerated in a civilized community—a proposition we find questionable on the facts presented—(see *Christenson* v. *Superior Court* (1991) 54 Cal.3d 868, 903 [2 Cal.Rptr.2d 79, 820 P.2d 181]), appellant cannot recover damages for fear of AIDS on a theory of intentional infliction of emotional distress.

### Battery

The first amended complaint and appellant's responsive pleadings on summary judgment generally averred that appellant's consent to surgery was vitiated because of Dr. Gordon's failure to disclose his HIV seropositivity during lengthy discussions with appellant about the risks of and alternatives to the proposed surgical procedure. Appellant did not assert that her consent to surgery was expressly conditioned on Dr. Gordon's good health. Rather, she took the position that the condition was clearly implied, and Dr. Gordon had a heightened duty of disclosure in light of appellant's preoperative questions about the risk of AIDS transmission from blood transfusions, and the state of the surgeon's health.

The trial court found that there was no battery as a matter of law based on the Supreme Court's holding in *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1] (hereafter *Cobbs*). The plaintiff in *Cobbs* suffered severe complications following recommended surgery for treatment of a peptic duodenal ulcer. The surgeon had explained the nature of the operation to the plaintiff, but had not discussed any of the risks inherent in the operation, including the complications actually suffered by the plaintiff. The plaintiff argued that a technical battery was committed because his consent to the surgery was vitiated by the surgeon's failure to advise him of the known risks.

The Supreme Court, in *Cobbs*, agreed with the majority of appellate court decisions which had limited liability for battery to those circumstances when a doctor performs an operation to which the patient has not consented. (*Cobbs, supra,* 8 Cal.3d at p. 240.) The court declared that when a doctor in obtaining consent violates his due care duty to disclose pertinent information, and an undisclosed inherent low probability complication occurs, the action should be pleaded in negligence. (*Ibid.*)

Appellant takes exception to the trial court's reliance on *Cobbs*, comparing her situation to that of the plaintiffs in *Ashcraft* v. *King* (1991) 228 Cal.App.3d 604 [278 Cal.Rptr. 900] (hereafter *Ashcraft*) and *Grieves* v. *Superior Court* (1984) 157 Cal.App.3d 159 [203 Cal.Rptr. 556] (hereafter *Grieves*). In *Ashcraft*, a surgeon performed an operation to correct the scoliosis of a teenage girl, disregarding the request of the girl's parents that only family donated blood be used during the operation. The child received

a transfusion of nonfamily blood contaminated by HIV. The trial court granted a motion for nonsuit on the plaintiffs' battery cause of action but the appellate court reversed the judgment.

In *Grieves*, a pregnant patient consented to have a tubal ligation following the delivery of her child. The complaint alleged that consent to the operation was expressly conditioned upon the birth of a normal, healthy child. The tubal ligation was performed and the child died two months later of a genetic disorder. The reviewing court found that the complaint alleged facts sufficient to state a cause of action for battery, and granted a writ of mandate reversing the lower court's order sustaining a demurrer. *Cobbs* was discussed and distinguished in both *Ashcraft* and *Grieves*.

Appellant contends that she effectively conveyed the limits of her consent—to avoid any risk of exposure to AIDS, and to be operated on by a healthy doctor. Dr. Gordon's performance of an invasive surgical procedure at a time when he knew he was infected with HIV therefore constituted a technical battery because, as in *Ashcraft* and *Grieves*, there was "an intentional deviation from the consent given." (*Cobbs*, *supra*, 8 Cal.3d at pp. 240-241.)

When we first considered this issue, we agreed with appellant that it was for the jury to determine whether consent to the surgery was expressly conditioned upon Dr. Gordon's good health, and whether a technical battery was committed. On reconsideration, we have reached a contrary conclusion about the viability of the battery cause of action based on the policy concerns underlying the *Potter* decision. Although the intentional tort of battery was not discussed by the Supreme Court in *Potter*, we can discern no reason why appellant's right to emotional distress damages on a theory of battery should not be subject to the same limitations imposed on claims for oppressive, fraudulent or malicious conduct, and intentional infliction of emotional distress, where physical injury or illness is absent. Since appellant's fear of developing AIDS is not based on knowledge, corroborated by reliable medical or scientific opinion, that her risk of developing AIDS has significantly increased *and* has resulted in an actual risk of AIDS that is significant, she cannot recover emotional distress damages on a technical battery theory.

During the pendency of this appeal, numerous organizations have submitted amici curiae briefs in support of respondents, including the California Medical Association, the American Civil Liberties Union of Southern California, the AIDS Project Los Angeles, the San Francisco AIDS Foundation and the Bioethics Committee of the Los Angeles County Bar Association.

Amici curiae raise an impressive array of public policy considerations bearing on a broad spectrum of fear of AIDS liability issues. For example, we have been invited to examine the broad social and political consequences of allowing plaintiffs to circumvent the informed consent doctrine by pleading an "express condition" theory of battery rather than negligence when personal information about a health care worker, rather than a material risk of the proposed medical procedure is withheld from a patient, or of imposing a legally enforceable duty on health care workers to disclose their HIV seropositivity to patients. Such issues are of great social import but they are beyond the scope of issues necessarily decided in this case. Respondents are entitled to affirmance of summary judgment on the limited ground that appellant cannot, under the principles of *Potter*, collect emotional distress damages resulting from her medically unsubstantiated fear of developing AIDS.

Accordingly, summary judgment is affirmed. The parties are to bear their own costs on appeal.

Boren, P. J, and Nott, J., concurred.