923 P.2d 1154

**Sonia MADRID, Plaintiff–Respondent,**

**v.**

**LINCOLN COUNTY MEDICAL CENTER, a New Mexico corporation, Defendant–Petitioner.**

**No. 23259.**

Supreme Court of New Mexico.

Aug. 21, 1996.

Rodey, Dickason, Sloan, Akin & Robb, P.A., W. Robert Lasater, Edward Ricco, Albuquerque, for Petitioner.

Alexander A. Wold, Jr., P.C., Alexander A. Wold, Jr., Walter M. Hart, III, Albuquerque, for Respondent.

## OPINION

RANSOM, Justice.

1. Sonia Madrid sued the Lincoln County Medical Center for negligent infliction of emotional distress arising from her fear that she might have contracted acquired immunodeficiency syndrome (AIDS) when exposed to bloody fluids while transporting medical samples from the Medical Center to laboratories in Albuquerque. She sought damages for medical and other expenses, lost earnings, and for pain and suffering. The Medical Center moved for summary judgment, arguing that as a matter of law Madrid could not recover because she could not prove the human immunodeficiency virus (HIV) was present in the medical sample that leaked. The trial court adopted the Medical Center's position that the presence of HIV must be proved and entered summary judgment. Madrid appealed.

2. The Court of Appeals reversed the summary judgment, holding that, in light of current New Mexico tort law, proof of actual HIV exposure is not required in a suit seeking emotional-distress damages resulting from a negligently caused fear of contracting AIDS through a medically sound channel of transmission. *Madrid v. Lincoln County Medical Ctr.,* 121 N.M. 133, 138, 909 P.2d 14, 19 (Ct.App.), *cert. granted,* 120 N.M. 828, 907 P.2d 1009 (1995). We granted the Medical Center's petition for a writ of certiorari because of our concern over apparent misinterpretation of current New Mexico tort law by the Court of Appeals.

3. We review the New Mexico tort law cited by the Court of Appeals, and—given the current medical impossibility of confirm-ing or ruling out HIV infection for six months to a year after a possible exposure and the foreseeability to parties in the healthcare industry that in today's climate of heightened anxiety over AIDS a person exposed to blood or other bodily fluids will suffer emotional distress which cannot readily be alleviated—we affirm that Court's rejection of an actual-exposure test.

4. *Facts and proceedings.* In September 1992 Sonia Madrid was transporting medical samples from the Medical Center to laboratories in Albuquerque. During transport one of the sample containers leaked, and Madrid was splashed with bloody fluid. Madrid claims that at the time of this incident she had unhealed paper cuts on her hands which came in contact with the bloody fluid and that any or all of two to four containers may have been the source of the leakage. Based on widespread publicity about the AIDS virus, Madrid knew that it was possible to contract AIDS by contact with blood or other bodily fluids through unhealed cuts. She had been advised by healthcare providers whom she had consulted following her contact with the bloody fluid that she should be tested for HIV several times over a six-month to one-year period.

5. Madrid learned approximately two months after she had come in contact with the bloody fluid that a patient from whom one of the samples had come had tested HIV-negative.[1] However, because she did not discover that only one specimen container had leaked until an affidavit was filed by the Medical Center in July 1994, and because she had been instructed that under the current medical state of the art HIV could go undetected for at least six months, Madrid did not accept the test results as conclusively ruling out infection.

6. In its motion for summary judgment the Medical Center urged the district court to adopt the rule accepted by a majority of courts and conclude that actual exposure to HIV is a threshold requirement in any claim

---

1. An employee of the laboratory to which Madrid was transporting the sample containers examined the shipment when it arrived in Albuquerque. He determined that a single container—holding a placenta—had leaked fluid. On Octo-ber 9, 1992, a technician at the Medical Center arranged for the patient who was the source of the placenta to be tested for HIV. The test results were reported to the Medical Center on October 13, 1992, and they were negative.

for emotional-distress damages arising out of a fear of having contracted AIDS. Madrid countered by arguing that summary judgment was improper as long as a jury could determine that her fear of having contracted AIDS was reasonable. The district court found it determinative that the bloody fluid splashed on Madrid had not been proved to contain HIV, concluding that "based upon the record ... and the state of the law that exists in other jurisdictions ... the motion for summary judgment has merit."

7. The Court of Appeals reversed the entry of summary judgment. Although the Court noted that "[t]he actual exposure test has been adopted by the majority of courts," it concluded that "in the overall context of New Mexico tort law" threshold proof of the presence of HIV in the disease-transmitting agent would not be required. *Madrid,* 121 N.M. at 138, 909 P.2d at 19. In reaching this conclusion, the Court first reasoned that New Mexico "no longer require[s] a plaintiff to suffer a physical impact in order to recover emotional distress damages." *Madrid,* 121 N.M. at 138, 909 P.2d at 19 (citing *Folz v. State,* 110 N.M. 457, 471, 797 P.2d 246, 260 (1990)). The Court then reasoned that "emotional distress damages are recoverable, even if they are the only damages alleged, as long as the plaintiff proves that they are 'severe.'" *Id.* at 139, 909 P.2d at 20 (citing *Flores v. Baca,* 117 N.M. 306, 313, 871 P.2d 962, 969 (1994)). Finally, the Court concluded that the Medical Center owes a duty to persons like Madrid to use ordinary care "to package the medical samples in such a way as to prevent leakage during transport." *Id.* at 141, 909 P.2d at 22 (citing *Torres v. State,* 119 N.M. 609, 615, 894 P.2d 386, 392 (1995), for proposition that New Mexico now rejects "zone of danger rule" for determining duty).

8. *New Mexico precedent is not determinative of this case.* While we first wish to emphasize that this is not a bystander-liability case, the Court of Appeals' reliance on bystander cases and their related rationale does require us to review such cases in order to clarify apparent confusion in terminology and in policies applicable to recovery for emotional distress. In *Ramirez v. Armstrong* we considered "whether a cause of action exists in New Mexico for negligent infliction of emotional distress to bystanders." 100 N.M. 538, 539, 673 P.2d 822, 823 (1983). There, members of Santana Ramirez family sued the driver of an automobile for emotional distress they suffered in either witnessing or being told of Santana's death. Santana was killed when he was struck by an automobile while crossing a Gallup street. Two of his children and a minor child living with him witnessed his death. A third child, who was not present at the scene of the accident, contended that she suffered severe emotional distress upon being told of her father's death.

9. In deciding whether to recognize a cause of action for negligent infliction of emotional distress to bystanders, we noted that three rules had been adopted in other jurisdictions "in an attempt to define the liability for negligence to a bystander: the 'impact rule,' the 'zone of danger rule,' and the '*Dillon* rule.'" *Id.* at 540, 673 P.2d at 824. Under the *Dillon* rule, a plaintiff who suffers shock or emotional distress from the contemporaneous observation of an accident involving a close family member is entitled to damages. *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 80–82, 441 P.2d 912, 920–21 (1968) (in banc). In *Ramirez* we rejected the prerequisite of an impact or presence in the zone of danger, and we adopted the *Dillon* rule with the modification that, in order to ensure the genuineness of emotional distress claims, the plaintiff would have to show some "physical manifestation of, or physical injury ... resulting from the emotional injury." 100 N.M. at 542, 673 P.2d at 826.

10. In *Folz* we took the "opportunity to reexamine the tort of negligent infliction of emotional distress articulated in *Ramirez.*" 110 N.M. at 460, 797 P.2d at 249. The precise issue we considered was "whether, to recover for severe shock from witnessing the death of her husband and fatal injuries to her son, an injured passenger in one of the automobiles was required to prove by expert

medical testimony, or otherwise, a *physical manifestation* of her emotional injury." *Id.* (emphasis added). Ultimately, we concluded that

> to establish the genuineness of a claim for negligent infliction of emotional distress, it is sufficient to allege and prove that (1) the plaintiff and the victim enjoyed a marital or intimate family relationship, (2) the plaintiff suffered severe shock from the contemporaneous sensory perception of the accident, and (3) the accident caused physical injury or death to the victim.

*Folz,* 110 N.M. at 471, 797 P.2d at 260.

11. Thus, the only change in the rule permitting bystander recovery for emotional distress following our decision in *Folz* was that the genuineness of a plaintiff's claim would no longer be measured by proof of some *subsequent* physical manifestation of an emotional trauma suffered as a result of witnessing the death of or great bodily injury to a close family member. Even in the interim between our decisions in *Ramirez* and *Folz,* no decision by this Court ever required that a bystander seeking damages for emotional distress suffer some physical *impact* in the death or injury-producing accident giving rise to his or her emotional-distress claims. Nor has this Court ever resolved whether, for example, a person involved in a car accident who suffers some physical injury may recover damages for the emotional distress associated with witnessing the death of or great bodily injury to another in that accident.

12. What we did say in *Folz* was

> The irony of this case is that Folz satisfies the impact rule allowing recovery by a nonfamily member for emotional distress, i.e., the most narrow standard upon which to base a claim for negligent infliction of emotional distress. Unlike the children in *Ramirez,* who were pure bystanders, Folz was a direct victim of the negligence of the defendants. "As such, the emotional ... injuries which have arisen as a proximate result of the defendant[s'] tortious act are compensable under the traditional rule for

recovery. The tortfeasor takes his victim as he finds him, the effect of his tortious act upon the person being the measure of damages."

110 N.M. at 471, 797 P.2d at 260 (quoting *Binns v. Fredendall,* 32 Ohio St.3d 244, 513 N.E.2d 278, 280 (1987)). Although the Medical Center does not argue against recognition of claims for emotional distress arising out of a fear of contracting AIDS from a disease-transmitting agent to which a victim is negligently exposed through a medically sound channel of transmission, it does argue that New Mexico should limit recovery by requiring threshold proof of "actual exposure." It is the invasive "impact" of the bloody fluid that gives rise to Madrid's claim for damages under the general rule that emotional injuries suffered by the victim of tortious impact are recoverable. *See Marchica v. Long Island R.R. Co.,* 31 F.3d 1197, 1204 (2d Cir. 1994) (holding that because plaintiff "suffered an actual physical injury [when he was stuck by a discarded hypodermic needle], the rule governing fear of future disease is inapposite and the traditional negligent infliction of emotional distress analysis applies"). We therefore analyze this case as a request by the Medical Center to impose an actual-HIV-exposure test for recovery of emotional-distress damages in the face of negligence causing an invasive contact with AIDS-related contaminants.

13. Consequently, while cases involving negligent infliction of emotional distress without "impact" are not relevant to the controlling issue, we note further that, contrary to the Court of Appeals suggestion in *Madrid,* this Court's decision in *Flores v. Baca* does not hold that outside of the bystander context there exists *in tort* a cause of action for negligent infliction of severe emotional distress. In *Flores* we decided whether damages for mental anguish caused by the breach of a funeral *contract* were within the contemplation of the parties. 117 N.M. at 311, 871 P.2d at 966. We expressly noted that "[t]here exists in New Mexico no recognized cause of action for negligent infliction of emotional distress except for bystander

liability." *Id.* at 310, 871 P.2d at 965. Further, we expressly declined to decide outside of bystander liability "whether to recognize a cause of action in tort for ... negligent infliction of mental distress to family members." *Id.*

14. Finally, the Court of Appeals' suggestion that the Medical Center owed a duty of reasonable care to Madrid because this Court abandoned the zone-of-danger rule in *Torres* is also misplaced. In *Torres* we held that police officers, charged by statute with investigating crimes, owe to persons of the public foreseeably at risk of injury by a party reported to be in violation of the criminal law "a duty to exercise the care ordinarily exercised by prudent and qualified officers." 119 N.M. at 615, 894 P.2d at 392. In reaching this conclusion, we considered and rejected the argument that the duty to investigate was owed only to persons within the state's political or geographical boundaries.

15. Apparently our statement that "the statutory duty to investigate logically must extend to benefit or protect all foreseeable victims, *including those persons outside the state*," *id.* (emphasis added), lies at the heart of the Court of Appeals' conclusion that "we no longer follow the 'zone of danger rule' for determining duty," *Madrid*, 121 N.M. at 138, 909 P.2d at 19. Nowhere in *Torres*, however, did we use the phrase "zone of danger rule" to distinguish the class of foreseeable plaintiffs residing within New Mexico from the class of foreseeable plaintiffs residing outside of New Mexico. Nor can the phrase properly be used to distinguish these classes of persons.

16. Other than the Court of Appeals' opinion in *Madrid*, the phrase "zone of danger rule" appears in only two New Mexico opinions—*Ramirez* and *Folz*. In *Ramirez*, when adopting a cause of action for bystander recovery, we noted that those jurisdictions adopting the zone-of-danger rule take the position that bystanders who are not in any danger of suffering the same physical impact they witnessed the victim suffer cannot recover emotional distress damages because

the elements of foreseeability of harm and duty of care are absent. 100 N.M. at 541, 673 P.2d at 825. In *Folz* we noted that the zone-of-danger rule was one of three rules "utilized by other jurisdictions to *circumscribe the liability* for negligent infliction of emotional distress to a bystander." 110 N.M. at 469, 797 P.2d at 258 (emphasis added). Describing this rule, we stated that it "would allow recovery if the plaintiff personally was within the zone of danger of physical impact," explaining that a court applying this rule had "held that a plaintiff may recover damages for injuries caused by witnessing serious injury or death of an immediate family member, when the defendant also negligently exposed the plaintiff to the same risk of bodily injury or death." *Id.* (citing *Bovsun v. Sanperi*, 61 N.Y.2d 219, 473 N.Y.S.2d 357, 362, 461 N.E.2d 843, 848 (1984)).

17. The phrase "zone of danger," when not used to describe a "rule," has appeared in seven New Mexico decisions. In both *Stambaugh v. Hayes*, 44 N.M. 443, 103 P.2d 640 (1940), and *Wilson v. Wylie*, 86 N.M. 9, 518 P.2d 1213 (Ct.App.1973), *cert. denied*, 86 N.M. 5, 518 P.2d 1209 (1974), the Court considered a case in which a minor bicyclist was struck and killed by a motorist. In *Stambaugh*, this Court analyzed whether it was error for the trial court to have refused the defendant's request to instruct the jury that he had no legal duty to anticipate or expect that there was a bicycle on the other side of a pickup truck in light of his contention that the decedent's bicycle was hidden from view by that truck. As grounds for the instruction, the defendant relied upon an Iowa case to the effect that "a driver of a motor vehicle is not legally bound to anticipate or know the intention or purpose of a person who, being in a zone of safety, suddenly and without warning enters a zone of danger and is struck by such vehicle." *Stambaugh*, 44 N.M. at 447, 103 P.2d at 642 (citing *Klink v. Bany*, 224 N.W. 540 (Iowa 1929)). This Court held that, as a matter of law, "A driver of an automobile on a busy street must anticipate that bicycles may fol-

low automobiles, as the latter may follow large trucks and thus be hidden from view." *Id.* There, the terms "zone of safety" and "zone of danger" were used not in relation to the foreseeability of intention or purpose, but rather as a description of the convergent courses traveled by the vehicles. When used again in *Wilson,* 86 N.M. at 13, 518 P.2d at 1217, the phrase "zone of danger" referred to the intersection in which a collision occurred. In neither *Stambaugh* nor *Wilson* was the term "zone of danger" used in relation to a "rule".

18. In *Calkins v. Cox Estates,* 110 N.M. 59, 792 P.2d 36 (1990), the phrase "zone of danger" was specifically used in relation to foreseeability: "In determining duty, it must be determined that the injured party was a foreseeable plaintiff—that he was within the zone of danger created by respondent's actions...." *Id.* at 61, 792 P.2d at 38; *see also Romero v. Byers,* 117 N.M. 422, 426, 872 P.2d 840, 844 (1994) (quoting *Calkins* ); *Solon v. WEK Drilling Co.,* 113 N.M. 566, 569, 829 P.2d 645, 648 (1992) (same); *Narney v. Daniels,* 115 N.M. 41, 51, 846 P.2d 347, 357 (Ct.App.1992) (same), *cert. denied,* 114 N.M. 720, 845 P.2d 814 (1993); *Johnson v. Sears, Roebuck & Co.,* 113 N.M. 736, 737, 832 P.2d 797, 798 (Ct.App.) (same), *cert. denied,* 113 N.M. 744, 832 P.2d 1223 (1992). In *Calkins* Justice Baca was not using "zone of danger" as a description of persons having some physical proximity to the tortfeasor or the accident; rather he was using the phrase as a description of the class of persons that a reasonable person would conclude based on the circumstances was subject to a risk by the defendant's acts or omissions. We did not abrogate this test of foreseeability in *Torres;* indeed, we reaffirmed it.

19. "Impact" or "wound" and "zone of danger or risk," as terminology and policy relative to foreseeability of emotional-distress injury from careless acts or omissions, are well stated in *Williamson v. Waldman,* 291 N.J.Super. 600, 677 A.2d 1179, 1180–81 (Ct.App.Div.1996):

> The court [in *De Milio v. Schrager,* 285 N.J.Super. 183, 666 A.2d 627 (Ct.Law Div.

1995) ] stressed the approach in 2 Fowler V. Harper & Fleming James, Jr., *The Law of Torts,* § 18.4 at 1036 (1956), which was at the heart of the governing principle of *Caputzal* [*v. The Lindsay Co.,* 48 N.J. 69, 222 A.2d 513 (1966) ]: "in the case of injury or sickness brought on by emotional disturbance, liability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted, thus then bringing the plaintiff within the 'zone of risk.' " We take the *De Milio* analysis to embody the idea that where a defendant's negligent act or omission provides an occasion from which a reasonable apprehension of contracting a deadly disease may eventuate, and where the quality of the conduct is such to create a presumption of exposure, the resulting claim for damages by reason of emotional injury may not be dismissed on summary judgment.

It cannot validly be said, as a matter of law, in the light of common knowledge, that a person who receives a puncture wound from medical waste reacts unreasonably in suffering serious psychic injury from contemplating the possibility of developing AIDS, even if only for some period of time, until it is no longer reasonable, following a series of negative tests, to apprehend that result. Indeed, one need not have actually acquired the HIV virus to be so affected by such a fear for a period, especially since some time must pass before an accurate test can be administered. We know of no reason, given existing circumstances and the realities of the times, as well as the policies that underlie tort law doctrine in this state, to require as a prerequisite to recovery for infliction of emotional distress that the plaintiff first establish actual exposure to the feared disease....

. . . .

... The idea is that courts ought not to be unduly reluctant to reach results consonant with the reasonable reactions of real people as long as basic principles of tort law are preserved, including those that

preclude the creation of duties that reasonably thoughtful defendants would not foresee.

■ 20. *The cause of action for emotional-distress damages based upon a fear of contracting AIDS.* As we pointed out earlier, the Medical Center does not argue against recognition of claims for emotional distress from fear of contracting AIDS by impact, but it does argue that New Mexico should limit recovery by requiring threshold proof of "actual exposure." This would compel claimants to prove both that HIV was present in the alleged disease-transmitting agent (blood, semen, vaginal secretions, etc.) and that a medically sound channel of transmission existed. The Medical Center cautions that recognizing a cause of action for all genuine emotional injuries "could impose heavy and disproportionate financial burdens upon defendants." Madrid counters that the Court of Appeals' decision requiring a sound channel of transmission, such as unhealed paper cuts, sufficiently limits liability and that a further requirement of proof of the presence of HIV would constitute an unnecessary impediment to genuine claims.

21. —*Contentions of the Medical Center.* The Medical Center cites a number of policy considerations that it claims support adoption of the majority actual-exposure rule. First, it notes that a potentially large class of plaintiffs with claims not limited by the requirement of actual exposure to HIV will substantially increase liability insurance premiums and may cause some individuals and businesses to forego insurance altogether. Second, the Medical Center contends that the Court of Appeals' decision here will have an especially detrimental impact in the health care field by increasing the cost of malpractice insurance and, in some instances, severely limiting the availability of health care. Third, the Medical Center cautions that without recognition of the additional threshold proof requirement that HIV be present "defendants and their insurers will be unable to ensure adequate compensation for those victims who actually develop [AIDS]." Fourth and finally, the Medical Center contends that

a threshold requirement is necessary to produce consistent results and encourage early settlement.

22. As support for these contentions, the Medical Center relies in part on *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 567, 863 P.2d 795, 812 (1993) (in bank). There, the California Supreme Court held that plaintiffs seeking to recover emotional-distress damages for fear of contracting cancer must establish as a medical probability that "the feared cancer will develop in the future due to the toxic exposure," *id.*, 25 Cal.Rptr.2d at 555, 863 P.2d at 800, and rejected a rule that would have required a plaintiff to demonstrate only that his or her fear of contracting cancer was reasonable, *id.*, 25 Cal.Rptr.2d at 565, 863 P.2d at 810. Although the court acknowledged that it "would be very hard pressed to find that, as a matter of law, a plaintiff faced with a 20 percent or 30 percent chance of developing cancer cannot genuinely, seriously and reasonably fear the prospect of cancer," *id.*, 25 Cal.Rptr.2d at 565, 863 P.2d at 811, for policy reasons it held that such fears were not legally compensable. Of particular importance to the court was the fact that "[a]ll of us are potential fear of cancer plaintiffs" because "all of us are exposed to carcinogens every day." *Id.* 25 Cal.Rptr.2d at 566, 863 P.2d at 811–12.

23. Relying on the California Supreme Court's decision in *Potter*, a California Court of Appeal held that a plaintiff cannot recover emotional-distress damages for a fear of contracting AIDS unless he or she can demonstrate two things:

> exposure to HIV or AIDS as a result of defendant's negligent breach of a duty owed to the plaintiff, and [his or her] fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is more likely than not he or she will become HIV seropositive and develop AIDS due to the exposure.

*Kerins v. Hartley*, 27 Cal.App.4th 1062, 33 Cal.Rptr.2d 172, 179 (1994). The *Kerins* court reasoned that "[a]ll of the policy con-

cerns expressed in *Potter* apply with equal force in the fear of AIDS context." 33 Cal. Rptr.2d at 178. Specifically, the court cited the "risk of compromising the availability and affordability of medical, dental and malpractice insurance" and speculated that "the coffers of defendants and their insurers would risk being emptied to pay for the emotional suffering of the many plaintiffs uninfected by exposure to HIV or AIDS, possibly leaving inadequate compensation for plaintiffs to whom the fatal AIDS virus was actually transmitted." *Id.* 33 Cal.Rptr.2d at 179.

■ 24. The Medical Center further points us to the Real Estate Disclosure Act, NMSA1978, §§ 47–13–1 to –3 (Repl. Pamp.1995), as an expression of New Mexico public policy supporting our adoption of a two-pronged "actual exposure" requirement. Under Section 47–13–2(C) of that Act

[a] seller, lessor or landlord of real property, including a participant in an exchange of real property and any agent involved in such a transaction, shall not be liable for failure to disclose and shall not have a duty to disclose ... the fact or suspicion that the real property is or has been:

. . . .

C. owned or occupied by a person who was exposed to, infected with or suspected to be infected with the human immunodeficiency virus or diagnosed to be suffering from acquired immune deficiency syndrome or any other disease that has been determined by medical evidence as highly unlikely to be transmittable to others through the occupancy of improvements to real property. . . .

The Medical Center argues that "the statute reflects a policy that fear of AIDS that is not rationally grounded in medical fact should not be given effect as a basis for legal relief." We agree; however, this does not dictate that we adopt a requirement that HIV be present in the disease-transmitting agent.

25. The Medical Center contends that "[a] fear of AIDS stemming from exposure to a substance that does not contain the AIDS virus has no more rational medical basis than does a fear of occupying living quarters formerly occupied by an AIDS patient." While this is true in hindsight, after confirming the absence of HIV infection, we cannot say as a matter of law that at the time a person is negligently exposed to a disease-transmitting agent (blood) through a medically sound channel of transmission (open wounds) a fear of contracting AIDS is irrational. Living quarters, on the other hand, are not known to be a disease-transmitting agent.[2]

26. —*Response of Madrid.* Madrid disagrees that threshold proof of the presence of HIV in the alleged disease-transmitting agent is necessary to address the policy concerns cited by the Medical Center and contends that recognition of emotional-distress claims arising out of a fear of contracting AIDS will not produce a flood of litigation. She argues that sufficient limitations on prospective claims would accrue from the requirement of a medically sound channel of transmission and from the fact that there is a limited or finite period of time during which a reasonable person might become legitimately fearful (without actual HIV infection). While the policy considerations cited by *Pot-*

---

2. Perhaps more relevant is the 1993 statute that allows sexually-transmitted-disease testing of offenders convicted of certain crimes. NMSA1978, § 24–1–9.1(A) (Repl.Pamp.1994). Later, during the 1996 session, the legislature passed "an act ... requiring a person formally charged for allegedly committing certain criminal offenses to undergo tests to identify sexually transmitted diseases *and the human immunodeficiency virus.*" 1996 N.M.Laws ch. 80 (emphasis added). Under this Act "[a] test designed to identify any sexually transmitted disease may be performed on a person, upon the filing of a complaint, information or an indictment alleging that the person committed a state criminal [sex]

offense." NMSA1978, § 24–1–9.2(A) (Cum. Supp.1996) (effective July 1, 1996). By requiring testing for sexually transmitted diseases, including HIV, under circumstances in which a channel of transmission exists, the legislature specifically has recognized the fears to be expected in persons potentially exposed to sexually transmitted diseases. This public policy supports the recognition of a duty on the part of individuals and entities such as the Medical Center to avoid negligent conduct that causes fear of HIV infection.

*ter* in the context of fear of cancer are not entirely inapplicable when considering fear of AIDS, they are not as compelling. For example, it is not true that each of us is exposed to the HIV virus every day. We also note that applying the rule we adopt today to the undisputed facts in *Kerins* we would dismiss that plaintiff's suit. The *Kerins* court noted that "[t]he detailed operative report of the surgery does not indicate that any cuts were sustained by [the doctor]," 33 Cal. Rptr.2d at 174, and thus there was no medically sound channel of transmission. Under the current state of medical knowledge, the absence of actual HIV infection will be known within six months after an exposure incident. Therefore, Madrid persuasively argues, as compared to the indefinite period in either *Potter* or *Kerins,* the period during which emotional distress may arise without actual HIV exposure will be much shorter. Madrid also argues that with the channel-of-transmission test making the size of the class of potential plaintiffs much smaller, there is little likelihood of disaster in the recognition of a cause of action for genuine cases of emotional distress without requiring proof that HIV was present.

27. Madrid further notes that not all cases in which a channel of transmission exists will yield a case for compensation. Under the Court of Appeals opinion, a plaintiff seeking damages still must prove all the elements of an ordinary negligence case. Recognition of a cause of action for emotional-distress damages is not therefore a matter of strict liability for persons dealing with potential disease-transmitting agents such as blood. Only those persons whose conduct departs from the standard of reasonable care and results in an exposure through a medically sound channel of transmission will be held liable.

28. —*Policy considerations.* The requirement of negligence will reduce the incidence of claims; the recognition of duty will reduce the incidence of negligence. As we observed in *Trujillo v. City of Albuquerque:*

> Our fault system of recovery, while by no means indispensable to our society in an abstract sense, today serves the important social functions of redistributing the economic burden of loss from the injured individuals on whom it originally fell, deterring conduct that society regards as unreasonable or immoral, and providing a vehicle by which injured victims may obtain some degree of compensation and satisfaction for wrongs committed against them and by which society may give voice and form to its condemnation of the wrongdoer.

110 N.M. 621, 624, 798 P.2d 571, 574 (1990) (footnote omitted).

29. Of the functions of the tort system cited in *Trujillo,* the goal of deterring unreasonable conduct is of primary relevance here. In light of the deadly nature of the AIDS virus, reasonable care should be encouraged, for example, in the handling of potential disease-transmitting agents such as blood products. The potential for liability encourages those engaged in conduct that may result in an exposure incident to use reasonable care. Further, the imposition of liability for unreasonable conduct deters others from repeating such conduct. To the extent that such a system of incentives and disincentives serves to decrease the number of exposure incidents, recognition of a cause of action for negligent infliction of emotional distress serves the laudable goal of promoting public health.

30. Essentially, the Medical Center invites us to conclude that recognition of a cause of action for emotional-distress damages without requiring proof that HIV was present in the alleged disease-transmitting agent will so dramatically increase costs that companies will be unable to afford insurance, will cease providing health care services, or will go bankrupt paying for emotional-distress claims. Such conclusions are speculative at best. The Medical Center does not cite any evidence of an insurance crisis in those jurisdictions that have rejected the actual exposure requirement that it advocates. While it may sound reasonable that recognition of a cause of action for damages will increase insurance premiums, without appro-

priate data or reference to actual experience, determining the precise extent of such an increase, if in fact there would be one, is purely a matter of conjecture. Because important policy goals are furthered by recognizing a cause of action for emotional distress from an invasive impact caused by negligence, we will not rely on unsubstantiated predictions of an insurance crisis as grounds for defeating such a cause of action.

31. *Conclusion.* Sound public policy supports recognition of a cause of action for emotional-distress damages in favor of one who fears that the negligence of another has caused him or her to contract HIV through a medically sound channel of transmission. Persons whose conduct may expose another to the HIV virus should be encouraged to use reasonable care. Madrid presented evidence that she was exposed to bloody fluids through unhealed paper cuts on her hands. It is also unclear whether or when she may have received information about how many sample containers may have leaked and the HIV status of the samples in those containers. On this record summary judgment was therefore inappropriate. We affirm the Court of Appeals and remand this matter to the trial court for further proceedings consistent with this opinion.

32. **IT IS SO ORDERED.**

BACA, C.J., and FRANCHINI, J., concur.