696 A.2d 14

KAREN WILLIAMSON AND JAMES WILLIAMSON, HER HUSBAND, PLAINTIFFS-RESPONDENTS, v. LEONARD WALDMAN, M.D., JEFFREY FELDMAN, M.D. AND JACQUES LOSMAN, M.D., DEFENDANTS-APPELLANTS, AND JOHN DOE, M.D. (A FICTITIOUS NAME), RICHARD ROE (A FICTITIOUS NAME), SUE SOE (A FICTITIOUS NAME) AND ABC–XYZ CORP. (A SERIES OF FICTITIOUS NAMES), DEFENDANTS.

Argued April 29, 1997—Decided July 21, 1997.

*Hugh Francis* argued the cause for appellant Jacques Losman, M.D. (*Francis & Berry*, attorneys; *Mr. Francis* and *Joan B. Lorio*, of counsel; *Peter A. Olsen*, on the brief).

*Stephen O. Mortenson* argued the cause for appellant Leonard Waldman, M.D. (*Mortenson & Pomeroy*, attorneys; *Robert J. Mormile*, on the brief).

*John Zen Jackson* argued the cause for appellant Jeffrey Feldman, M.D. (*Jackson & Buckley*, attorneys; *Sean P. Buckley*, of counsel; *Daniel R. Esposito*, on the brief).

*David M. Fried* argued the cause for respondents (*Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This case is based on plaintiff's complaint for negligent infliction of emotional distress resulting from her fear of contracting AIDS. Plaintiff, a cleaning person, was pricked by a sharp medical instrument that had been discarded improperly in a general trash receptacle at an office shared by several medical doctors. Fearing that she had contracted AIDS from the prick, plaintiff instituted this suit against the doctors to recover damages for her emotional distress.

The case requires the Court to consider the standard for establishing causation for emotional distress attributable to the fear of contracting AIDS through infection from the HIV virus. More specifically, the issue posed is whether the standard of causation is based on objective factors, such as the actual exposure to HIV and/or the exposure to a viable means or channel of transmission of HIV; or, in the alternative, whether it is sufficient to demonstrate the reasonableness of the claimant's emotional distress over the fear of contracting AIDS.

I

Plaintiff, Karen Williamson, worked for her husband's cleaning business. On June 6, 1991, plaintiff was pricked by a lancet while cleaning a common-trash receptacle in the examining room of offices occupied by defendant doctors, Leonard Waldman, Jeffrey Feldman, and Jacques Losman. A lancet or "short sharp" is "a surgical knife with a small, sharp-pointed, two-edged blade" that is used to prick fingers to acquire blood samples. *Stedman's Concise Medical Dictionary* 551 (2d ed.1994).

After being pricked, plaintiff finished up, washed her hands, and went home for the night. On the way home from work, plaintiff

went to her sister-in-law's home and, while there, discussed the incident with an acquaintance who was a nurse. As a result of that discussion plaintiff became alarmed, particularly over the potential of contracting hepatitis and AIDS. The nurse informed plaintiff that she should go to the emergency room immediately. Instead, plaintiff made an appointment to see her family physician, Jerome DeMasi.

On June 10, 1991, four days after the incident, plaintiff visited Dr. DeMasi, who recommended that she be tested for the human immunodeficiency virus ("HIV") annually for seven to ten years. (Although Dr. DeMasi subsequently modified the time period for testing to a "year or two," plaintiff was not informed of that until November 1994.) Whether an HIV test was administered during that initial visit is unclear. According to Dr. DeMasi, he did not conduct an HIV test because he believed it was too soon following the incident to obtain a meaningful result. Plaintiff avers, however, that she was tested. Dr. DeMasi informed plaintiff that a test taken a year from the date of the incident would be most decisive in determining whether she was infected.

Eight months later, in February 1992, plaintiff returned to Dr. DeMasi complaining of fatigue. During that visit, blood work was ordered, without an HIV test, and plaintiff was prescribed anti-depressant medication.

Since the incident, plaintiff has been tested for HIV several times, each test showing her to be HIV-negative. According to plaintiff, she underwent blood tests for HIV and hepatitis in July 1992, both of which proved negative. Moreover, she was tested in July 1993, and July 1994; again, both tests were negative. After the second negative test result, Dr. DeMasi informed plaintiff that her chances of having contracted HIV from the incident were "slim or remote."

Plaintiff asserts that as a result of the lancet-stick incident, she has become depressed and suffered "lifestyle changes." For example, at the time of the incident, the Williamsons were contemplating having another child. Because plaintiff's husband carries a

rare blood disorder, known as neutropenia, which was passed along to their daughter, the Williamsons originally postponed having more children. According to plaintiffs, neutropenia prevents a person from properly fighting infections. Prior to the incident, however, plaintiff's husband had been taking a drug to control the effects of the disorder, which gave them hope of having another child. Since the incident, however, plaintiff has refused to have another baby, because she fears that the child will be born HIV-positive. Plaintiff also asserts that she and her husband have engaged only in protected sexual relations since the incident.

On May 19, 1993, the Williamsons filed a complaint in the Law Division against defendants Drs. Waldman, Losman, and Feldman. The complaint alleged that defendants breached their duty "to use reasonable care to inspect and [to] make the premises reasonably safe," [1] and that because of defendants' actions, plaintiff suffered "severe personal injuries, . . . great physical and mental pain . . . [and] loss of enjoyment of life." *Ibid.* Moreover, defendants' breach allegedly led to a loss of earning capacity and resulted in the need for "future medical treatments and/or hospitalizations." Regarding plaintiff's husband, James, the complaint alleged that, as a result of defendants' actions, James was deprived of "the support, society, . . . consortium, [and] services . . ." of his wife. Subsequently, during a deposition, Dr. DeMasi described plaintiff as a "nervous person" who had had several bouts of depression prior to the incident. Moreover, prior to the incident, Dr. DeMasi had referred her to other medical professionals for treatment for depression.

---

[1] The disposal of lancets and similar medical implements in common-trash receptacles is prohibited by regulation. Thus, this waste must be disposed of in appropriate medical-waste receptacles and must be labeled accordingly. *N.J.A.C.* 7:26–3A. The relevant regulations include: *N.J.A.C.* 7:26–3A.10 (segregation requirements); *N.J.A.C.* 7:26–3A.11 (packaging requirements); *N.J.A.C.* 7:26–3A.12 (storage requirements); *N.J.A.C.* 7:26–3A.14 (labeling requirements); *N.J.A.C.* 7:26–3A.15 (marking requirements); *N.J.A.C.* 7:26–3A.16 (general requirements).

After discovery was completed, defendants filed motions for summary judgment, which the Law Division granted, dismissing without prejudice plaintiff's claim for negligent infliction of emotional distress. The court found that plaintiff had failed to demonstrate that she was exposed to HIV. Moreover, the Law Division found that, given her negative test results, her continued fear was "idiosyncratic" and that, as a result, defendants' acts were not the proximate cause of her emotional distress. The Appellate Division reversed and remanded, holding that plaintiff was not required to demonstrate actual exposure to HIV but could recover based on the reasonableness of her fears, which created a jury question. 291 *N.J.Super.* 600, 677 *A.*2d 1179 (1996). Defendants each filed petitions for certification, which we granted. 147 *N.J.* 259, 686 *A.*2d 761 (1996).

## II

A cause of action for negligent infliction of emotional distress involves traditional concepts of duty, breach, and causation. *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 74–75, 222 *A.*2d 513 (1966). To establish liability for this tort, "a plaintiff must prove that defendant's conduct was negligent and proximately caused plaintiff's injuries." *Decker v. Princeton Packet*, 116 *N.J.* 418, 429, 561 *A.*2d 1122 (1989). Determining defendant's negligence "depends on whether defendant owed a duty of care to the plaintiff, which is analyzed in terms of foreseeability." *Ibid.; see Dunphy v. Gregor*, 136 *N.J.* 99, 642 *A.*2d 372 (1994) (allowing emotional-distress damages for unmarried cohabitant who witnessed death of fiance after being struck by car); *Strachan v. John F. Kennedy Memorial Hosp.*, 109 *N.J.* 523, 533, 538 *A.*2d 346 (1988) (recognizing emotional distress of parents attributable to hospital's delay in releasing body of their dead son); *see also Falzone v. Busch*, 45 *N.J.* 559, 561, 568–69, 214 *A.*2d 12 (1965) (upholding plaintiff's claim for damages based on the foreseeability of the defendant's coming "so close to [her] as to put her in fear for her safety," without actual physical harm). Similarly, to

establish that the alleged negligence constitutes the proximate cause of the emotional injury, the emotional distress must be reasonably foreseeable. *Compare Carey v. Lovett,* 132 *N.J.* 44, 59, 622 *A.*2d 1279 (1993) (permitting mother's claim for emotional distress based on doctor's misdiagnosis of fetus because "the physical and emotional ties between mother and fetus so unite them that a physician should anticipate that any malpractice that adversely affects the fetus will cause emotional distress to the mother") *and Devlin v. Johns–Manville Corp.,* 202 *N.J.Super.* 556, 561, 495 *A.*2d 495 (Law Div.1985) (recognizing claim for serious emotional distress over fear of cancer, based on exposure to asbestos, because plaintiff's reaction was not unexpected in "normally constituted people") *with Decker, supra,* 116 *N.J.* at 431, 561 *A.*2d 1122 (denying claim for emotional distress based on plaintiff's reading erroneous obituary announcement on ground that serious lasting emotional distress would not be foreseeable); *Buckley v. Trenton Sav. Fund Society,* 111 *N.J.* 355, 368–69, 544 *A.*2d 857 (1988) (denying claim for emotional distress based on bank's wrongful dishonor of plaintiff's check to former wife); *and Caputzal, supra,* 48 *N.J.* at 76–77, 222 *A.*2d 513 (disallowing claim for emotional distress because heart attack from consuming brown water was "idiosyncratic"). In addition, the emotional injury must be genuine and substantial. *See Carey,. supra,* 132 *N.J.* at 58, 622 *A.*2d 1279; *Buckley, supra,* 111 *N.J.* at 365, 544 *A.*2d 857; *Strachan, supra,* 109 *N.J.* at 537–38, 538 *A.*2d 346. These principles of causation based on the reasonable foreseeability of substantial emotional distress attributable to a defendant's negligence may also be found in the context of "toxic-tort" cases. *E.g., Mauro v. Raymark Indus.,* 116 *N.J.* 126, 132–36, 137–41, 561 *A.*2d 257 (1989) (finding that plaintiff could recover damages for emotional distress based on reasonable concern that he or she has enhanced risk of contracting cancer as a result of exposure to asbestos).

The majority of jurisdictions that have addressed the issue of the standard for determining proximate cause of emotional distress arising from the fear of contracting AIDS have imposed an objective standard. *See K.A.C. v. Benson,* 527 *N.W.*2d 553, 560

(Minn.1995). Most of the courts that apply the objective standard require the claimant to demonstrate actual exposure to the HIV virus as a condition for establishing proximate causation. *See Burk v. Sage Products,* 747 *F.Supp.* 285, 286 (E.D.Pa.1990) (rejecting claim for negligent infliction of emotional distress because plaintiff nurse, who was pricked by needle, could not demonstrate that needle exposed her to HIV); *Neal v. Neal,* 125 *Idaho* 617, 873 *P.*2d 871 (1994) (rejecting plaintiff wife's fear-of-AIDS claim against adulterous husband because plaintiff could not prove that husband or adulterous-partner was HIV-positive); *K.A.C., supra,* 527 *N.W.*2d at 560 (rejecting plaintiff's claim for emotional distress because HIV-positive doctor had worn gloves during gynecological procedure); *Brown v. New York City Health & Hosps.,* 225 *A.D.*2d 36, 648 *N.Y.S.*2d 880, 886 (1996); *Doe v. Doe,* 136 *Misc.*2d 1015, 519 *N.Y.S.*2d 595 (Sup.Ct.1987); *Carroll v. Sisters of Saint Francis Health Servs.,* 868 *S.W.*2d 585, 594 (Tenn.1993). *Compare Johnson v. West Virginia Univ. Hosps.,* 186 *W.Va.* 648, 413 *S.E.*2d 889, 892–95 (1991) (ruling that plaintiff, hospital security guard who was bitten while attempting to subdue AIDS patient, could bring claim for emotional distress arising from fear of AIDS) *with Funeral Services by Gregory v. Bluefield Community Hosp.,* 186 *W.Va.* 424, 413 *S.E.*2d 79, 80, 82–84 (1991) (rejecting mortician's emotional-distress claim arising from embalming of AIDS-infected corpse because mortician wore protective gear and did not injure himself during the process), *overruled in part on other grounds by Courtney v. Courtney,* 190 *W.Va.* 126, 437 *S.E.*2d 436, 443 (1993).

Some of those courts expressly have added the further requirement that a plaintiff prove a medically sound channel of transmission of the HIV virus. *See, e.g., Brown, supra,* 648 *N.Y.S.*2d at 887 (requiring that plaintiff prove not only that blood or fluid was in fact transferred from HIV-positive person but also existence of scientifically accepted method of transmission of the virus); *Ordway v. County of Suffolk,* 154 *Misc.*2d 269, 583 *N.Y.S.*2d 1014 (Sup.Ct.1992) (denying recovery to doctor who performed surgery on AIDS-infected patient in absence of proof of channel of trans-

mission); *accord Madrid v. Lincoln County Med. Ctr.*, 122 *N.M.* 269, 923 *P.*2d 1154 (1996) (adopting "pure channel of transmission" test and ruling that plaintiff who was splashed with blood while transporting medical samples could recover for fear of contracting AIDS because blood allegedly made contact with unhealed cuts on her hand, despite plaintiff's inability to prove the blood was infected with HIV). In addition to proving actual exposure and/or a channel of transmission, some courts require the plaintiff to demonstrate a probability that he or she will develop AIDS. *See, e.g., Kerins v. Hartley*, 27 *Cal.App.*4th 1062, 33 *Cal.Rptr.*2d 172, 174 (1994) (*Kerins II* ) ("[E]motional distress damages due to fear of AIDS [are] legally noncompensable unless the plaintiff alleges and proves actual exposure, and it is more probable than not that the plaintiff will actually develop the disease."); *cf. Lubowitz v. Albert Einstein Med. Ctr.*, 424 *Pa.Super.* 468, 623 *A.*2d 3 (1993) (denying ovum-recipient's fear-of-AIDS claim when donor initially tested HIV-positive but retested negative).

Some jurisdictions have adopted a "reasonableness" standard of recovery for emotional-distress claims based on the fear of AIDS. That standard allows a plaintiff to recover for emotional distress without demonstrating either actual exposure to the HIV virus or a viable channel of transmission of the virus.

In *Faya v. Almaraz*, 329 *Md.* 435, 620 *A.*2d 327 (1993), the court adopted a foreseeable-risk standard, holding that two patients operated on by an HIV-infected doctor could recover emotional-distress damages, even though they could not prove actual exposure to, or a means of transmission of, the HIV virus—there was no evidence that the doctor had cut himself or bled into the surgical area. The court stated:

[W]e cannot say that appellants' alleged fear of acquiring AIDS was initially unreasonable as a matter of law, even though the averments of the complaints did not identify any actual channel of transmission of the AIDS virus. [A requirement] that plaintiffs must allege actual transmission would unfairly punish them for lacking the requisite information to do so.

[*Id.* 620 *A.*2d at 336–37.]

In *Castro v. New York Life Ins. Co.*, 153 *Misc.*2d 1, 588 *N.Y.S.*2d 695 (Sup.Ct.1991), the plaintiff was a cleaning worker who was stuck with a hypodermic needle improperly discarded in an ordinary waste container. Plaintiff sued for her alleged emotional distress and fear of AIDS. The court stated that "[i]f a claim can be tied to a distinct event which could cause a reasonable person to develop a fear of contracting a disease like AIDS, there is a guarantee of genuineness of the claim," without proving either actual exposure or the existence of a medically sound channel of transmission. *Id.* 588 *N.Y.S.*2d at 697; *see Marchica v. Long Island R.R.*, 31 *F.*3d 1197 (2d Cir.1994) (holding that plaintiff who was stuck by needle hidden in pile of garbage, could recover under Federal Employers' Liability Act for emotional distress caused by fear of AIDS without proving actual exposure to HIV and without demonstrating medical probability of later developing disease), *cert. denied, sub nom., Long Island R.R. v. Marchica*, 513 *U.S.* 1079, 115 *S.Ct.* 727, 130 *L.Ed.*2d 631 (1995); *Howard v. Alexandria Hosp.*, 245 *Va.* 346, 429 *S.E.*2d 22, 24–25 (1993) (permitting patient to recover emotional-distress damages for fear of AIDS when plaintiff was operated on with unsterilized instruments, even though there was no evidence that instruments had been used on HIV-infected person).

Policy considerations support the actual-exposure and/or channel-of-transmission requirements, because absent such requirements for establishing proximate cause, speculative, unreliable and fraudulent claims "could provoke a flood of ill-justified litigation." *Brown, supra,* 648 *N.Y.S.*2d at 886. Foremost among the policy considerations that are marshalled in support of the strict objective standard of causation is the need to counteract general ignorance about AIDS. *See* Karen L. Chadwick, *Fear Of AIDS: The Catalyst For Expanding Judicial Recognition Of A Duty To Prevent Emotional Distress Beyond Traditional Bounds,* 25 *N.M. L.Rev.* 143, (1995) (noting that "a large portion of the public is either ignorant of how AIDS is transmitted or chooses not to believe it"). Ignorance about AIDS fosters hysteria and irrational fears of contracting AIDS, as well as prejudice, stigmatization and

discrimination directed against those infected with the disease. *See* Vance A. Fink, Jr., Comment, *Emotional Distress Damages for Fear of Contracting AIDS: Should Plaintiffs Have to Show Exposure to HIV?*, 99 *Dick. L.Rev.* 779, 802–03 (1995) ("A plaintiff's anxiety about contracting AIDS often reflects general misperceptions that exist in our society about the disease. Public reactions and stigmas associated with AIDS will likely have some effect on the numbers and types of claims brought by people who fear contracting AIDS because of some encounter with an HIV-infected individual. Studies indicate that stigmatizing attitudes and erroneous beliefs about AIDS and AIDS patients are still prevalent in our society. One such study found that a large number of people still believe HIV can be transmitted through casual contact, such as kissing, sharing drinking glasses, using public lavatory facilities, being coughed or sneezed on by an infected person, or through insect bites.") (citations omitted). Thus, a low threshold for establishing proximate cause, such as the reasonableness standard, will not discourage misleading and inaccurate information or counteract ignorance concerning AIDS. *See* Brian R. Graves, *Fear of AIDS,* 3 *J. Pharmacy & L.* 29 (1994); Fink, *supra,* 99 *Dick. L.Rev.* 779; James C. Maroulis, Note, *Can HIV–Negative Plaintiffs Recover Emotional Distress Damages for Their Fear of AIDS?*, 62 *Fordham L.Rev.* 225 (1993).

Despite those policy considerations, the objective standard of causation requiring proof of actual exposure and/or a viable channel of transmission as a condition of recovery has been criticized because it does not directly address the need for, and availability of, accurate information about AIDS, and thus does not effectively counteract ignorance. *See* Edward M. Slaughter, *AIDS Phobia: The Infliction of Emotional Distress and the Fear of AIDS,* 16 *U. Haw. L.Rev.* 143, 160 (1994) (stating in respect of the actual-exposure requirement, that "[t]he inference is that a reasonable person of ordinary intelligence would not fear that he would develop AIDS unless he had proof that he had actually been exposed to the virus. This is contrary to common experience, however."); Mandana Shahvari, Comment, *Afraids: Fear of AIDS*

as a Cause of Action, 67 *Temp. L.Rev.* 769, 792 (1994) (observing that it seems "inappropriate" to "measure the reasonableness of a plaintiff's fear by the quantum of evidence at the plaintiff's disposal, and label all fear of AIDS in the absence of proof of HIV exposure to be phobic.").

Several considerations support the adoption of the reasonableness approach. That approach avoids the harsh and unfair results that occur from a strict application of the objective test. *See Faya, supra,* 620 A.2d at 336–37; *supra* at 240–241, 696 A.2d at 17–18 (cases cited). Moreover, a test based on reasonableness encourages the use of reasonable care in preventing the potential exposure of another to HIV. *Madrid, supra,* 923 P.2d at 1163; Bollinger, *supra,* 16 *J. Legal Med.* at 419; *see also People Express Airlines v. Consolidated Rail Corp.,* 100 *N.J.* 246, 255, 495 A.2d 107 (1985) ("Imposing liability on defendants for their negligent conduct discourages others from similar tortious behavior."). The reasonableness standard can assure the genuineness of claims for emotional distress over the fear of contracting AIDS. *Castro, supra,* 588 *N.Y.S.2d* at 697. In addition, the reasonableness standard accommodates the tort policy of providing redress for harm suffered at the hands of another. *See Falzone, supra,* 45 *N.J.* at 566–67, 214 A.2d 12 ("[A] court should not deny recovery for a type of wrong which may result in serious harm because some people may institute fraudulent actions.").

In determining the duty of care that is owed a tort victim, courts are enjoined to consider and weigh matters of public policy. *Butler v. Acme Markets,* 89 *N.J.* 270, 277, 445 A.2d 1141 (1982). "The actual imposition of a duty of care and the formulation of the standards defining such a duty derive from considerations of public policy and fairness." *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 A.2d 1110 (1993); *see Carter Lincoln–Mercury v. EMAR Group,* 135 *N.J.* 182, 194–95, 638 A.2d 1288 (1994). Moreover, the limit of proximate cause is, ultimately, an issue of law and similarly entails a consideration of public policy and fairness. *Caputzal, supra,* 48 *N.J.* at 77, 222 A.2d 513.

"Proximate or legal causation is that combination of 'logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." *People Express, supra,* 100 *N.J.* at 264, 495 *A.*2d 107 (quoting *Caputzal, supra,* 48 *N.J.* at 77–78, 222 *A.*2d 513).

Because the negligent infliction of emotional injury invokes basic tort principles, *see* discussion, *supra* at 240–241, 696 *A.*2d at 17–18, we must consider, in determining the appropriate standard for establishing proximate cause, the fundamental policies that traditional tort doctrine promotes. By that analysis, we conclude that the reasonableness standard of proximate cause can appropriately and directly fulfill the basic goals of tort law in the context of claims based on the negligent infliction of emotional distress arising from the fear of contracting AIDS.

The reasonableness standard of proximate cause, however, does not sufficiently accommodate other significant considerations of public policy that are relevant in determining legal responsibility for emotional injury attributable to the fear of contracting AIDS. Ignorance of AIDS and its resultant social consequences implicate serious public-policy concerns. The strength of those concerns is evidenced by the prevalence and persistence of ignorance about AIDS and the extent to which it dominates the reasoning of the many courts that have adopted the strict objective test. It is thus appropriate in determining the standard for establishing proximate causation of emotional distress over the fear of contracting AIDS that this public-policy concern be carefully weighed. Therefore, as a matter of sound public policy, the standard of proximate cause should require as an element of the test of causation a level of knowledge of the etiology and risks of AIDS that can serve to overcome and effectively discourage the kind of ignorance that nourishes the hysteria and irrational fear of contracting AIDS, which, in turn, perpetuate the prejudice and discrimination that surround the AIDS epidemic. The reasonableness standard for determining proximate cause can be formulated to incorporate a

test of causation that requires and presumes that level of knowledge, thereby serving to overcome concerns about the widespread and enduring ignorance regarding the disease. Accordingly, the reasonableness standard should be enhanced by the imputation to a victim of emotional distress based on the fear of contracting AIDS of that level of knowledge of the disease that is then-current, accurate, and generally available to the public.

In this case, the Appellate Division adopted a reasonableness standard of proximate cause and held that plaintiff was not required to establish actual exposure to recover emotional-distress damages for fear of AIDS. 291 *N.J.Super.* at 604–05, 677 *A.2d* 1179. The Appellate Division stated:

> We know of no reason, given existing circumstances and the realities of the times, as well as the policies that underlie tort law doctrine in this state, to require as a prerequisite to recovery for infliction of emotional distress that the plaintiff first establish actual exposure to the feared disease. The cause of action is "based on a reasonable concern that [the claimant] has an enhanced risk of ... disease," and a claim for medical surveillance damages.
>
> [*Ibid.* (quoting *Mauro, supra,* 116 *N.J.* at 137, 561 *A.2d* 257) (citations omitted).]

In considering the reasonableness of plaintiff's fears, the Appellate Division found that "[i]t cannot validly be said, as a matter of law, in light of common knowledge, that a person who receives a puncture wound from medical waste reacts unreasonably in suffering serious psychic injury from contemplating the possibility of developing AIDS ... following a series of negative test results...." *Id.* at 604, 677 *A.2d* 1179.

The standard of proximate cause, as expressed by the Appellate Division, relies on "common knowledge" as a basis for determining the reasonableness of a claimant's fears. Generally, the reasonableness standard has not required any level of knowledge beyond that attributable to average persons of ordinary experience as an element in defining reasonableness. *See Kerins v. Hartley,* 21 *Cal.Rptr.2d* 621, 632 (Ct.App.1993) (*Kerins I* ) ("It would be unreasonable to assume that at the moment of the broadcast, [triggering appellant's "initial alarm at hearing news that her surgeon had risked infecting patients with AIDS"], appellant had

at her fingertips the most recent statistical data regarding the remote risk of AIDS transmission to a patient by an HIV-infected surgeon"), *vacated,* 28 *Cal.Rptr.*2d 151, 868 *P.*2d 906 (Cal.1994); *see also Faya, supra,* 329 *Md.* 435, 620 *A.*2d 327 (adopting reasonableness standard that did not require any level of knowledge in determining whether plaintiff was reasonable in experiencing emotional distress over the fear of contracting AIDS).

A reasonableness standard that requires only common knowledge about AIDS, however, does not address adequately concerns about the prevalence of misinformation and ignorance, *see* Fink, *supra,* 99 *Dick. L.Rev.* at 801, and thus serves indirectly to encourage hysteria as well as prejudice and discrimination against people living with HIV. The standard has, therefore, been faulted because it does not confront the need to overcome ignorance by requiring a higher degree of knowledge of AIDS. As one commentator has argued:

> Decisions like *Kerins [I]* and *Faya* are dangerous because they relieve individuals of the responsibility of accessing basic information concerning the transmission of AIDS and risk reliance on a more subjective and inconsistent standard of reasonableness. The lack of HIV education should be immaterial in evaluating a plaintiff's fear of contracting AIDS. It is not difficult to imagine that most individuals lack such information in their homes. The court's focus should be on the ready access to information from external sources. While the plaintiff in *Faya* may not have had statistical information regarding the risk of transmission associated with invasive surgical procedures in her home at the moment she viewed the disturbing television program, she could have contacted an AIDS hotline, another physician, or a clinic and obtained such information with relative ease. Courts must encourage individuals to take some responsibility for educating themselves concerning their health and welfare.
>
> [Shahvari, *supra,* 67 *Temp. L.Rev.* at 794.]

Moreover, the enhancement of the reasonableness standard through the imputation of a higher level of knowledge as a basis for recovery for emotional distress based on the fear of contracting AIDS is not unfair or unduly harsh. As the court in *Castro, supra,* observed:

> Given the massive informational campaign waged by federal, state and local health officials over the last few years in an effort to educate the public about this dreadful disease, any reasonable person exposed to this information who is stuck

by a used and discarded hypodermic needle and syringe from which blood was apparently drawn could develop a fear of contracting AIDS.

The medical community has been unwavering in its view that the HIV virus can be transmitted through the blood. Castro testified at her deposition that she had seen commercials about the disease on television. She was therefore aware of the possibility of contracting the disease through HIV contaminated blood.

[588 *N.Y.S.2d* at 698.]

Accordingly, we hold that a person claiming damages for emotional distress based on the fear that she has contracted HIV must demonstrate that the defendant's negligence proximately caused her genuine and substantial emotional distress that would be experienced by a reasonable person of ordinary experience who has a level of knowledge that coincides with then-current, accurate, and generally available public information about the causes and transmission of AIDS.

## III

In denying plaintiff's emotional-distress claim, the trial court held that the lancet-stick incident was not the proximate cause of her distress. In reaching that conclusion, the court applied the actual-exposure test. However, the court also stated:

[A]s this case is currently posited, plaintiff has been tested five time[s] during the last four years for HIV and hepatitis, and all such tests have yielded negative results. She has been informed by her own doctor that after this passage of time her chances of getting HIV are "slim or remote." Defendants' physician expert assures that after tests confirmed no anti-bodies within three months of the event, her chances are "zero[.]" Despite all this, plaintiff claims continued psychic damage and emotional distress. *This Court concludes that plaintiff's reaction to favorable tests and her alleged continued distress in the face of same is idiosyncratic and demonstrates her not to be a person of average constitution.*

[ (Emphasis added).]

Hence, the court found that plaintiff's continued emotional distress was a highly extraordinary result, and, accordingly, the defendants' breach was not the legal cause of her injuries.

The Appellate Division disagreed that plaintiff's claim for emotional distress was unreasonable as a matter of law. It stated that:

> [I]t cannot be concluded as a matter of law that plaintiff reacted unreasonably or unforeseeably. Fearing that she faced serious injury as a result of exposure to HIV, it is not unreasonable that she would be greatly upset during the period of time that was necessary to obtain medical assurance that she was not infected. It may very well be that there is some period of time after receiving a puncture wound from medical waste during which any person would experience a range of medical reactions, from mere anxiety to actionable emotional distress, and ought to be eligible for compensation therefor if she meets the required tests, including the serious injury standard applying to all claims based on infliction of emotional distress.
>
> [291 *N.J.Super.* at 605–06, 677 *A.*2d 1179.]

The appellate court concluded that:

> Plaintiff will be successful only if the jury finds negligence by defendants, and only to the extent it finds serious or substantial emotional injury from reasonably experienced emotional distress ... including such permanent consequences as may be found, from the date of the puncture incident to whatever point, after medical consultation and tests, a reasonable person would cease to be so emotionally affected by the incident as to be visited with such dire consequences.
>
> [*Id.* at 607, 677 *A.*2d 1179 (citations omitted).]

 Emotional-distress damages must be based on the fears experienced by a reasonable and well-informed person. Thus, that emotional distress should be limited to the "window of anxiety," that is, the period after which such a reasonable and well-informed person no longer would experience continuing emotional distress. In *De Milio v. Schrager,* 285 *N.J.Super.* 183, 201, 666 *A.*2d 627 (Law Div.1995), the court defined the window of anxiety as the period from the time of possible exposure to that point when a plaintiff knows or should know that she was not infected with HIV. That window appears to range from six months to a year after exposure. *E.g., Faya, supra,* 620 *A.*2d at 337; *see* Lawrence O. Gostin, et al., *HIV Testing, Counseling, and Prophylaxis After Sexual Assault,* 271 *JAMA* 1436, 1439 (1994) (stating that the vast majority of individuals infected with HIV have detectable antibodies within three to six months).

 Here, because plaintiff repeatedly tested negative for HIV, her continued distress is idiosyncratic, as found by the trial court, that is, it exceeded the emotional distress that would be experienced by a reasonable and well-informed person. However,

the distress she suffered during the "window of anxiety" would be reasonable, and could be compensable.

The application of the "window of anxiety" test in this case is complicated, however, by the fact that plaintiff apparently received incorrect information from a health-care professional. That circumstance clearly extended plaintiff's emotional distress beyond the reasonable "window of anxiety." The question, then, is whether the duration of plaintiff's emotional distress that extended beyond the "window of anxiety" was proximately caused by defendant doctors.

Four days after being pricked by the lancet, plaintiff sought medical advice from Dr. DeMasi. Unfortunately, Dr. DeMasi misinformed plaintiff that she needed to be tested for HIV annually for seven to ten years. Although Dr. DeMasi subsequently modified the period for continued testing to a "year or two," plaintiff was not informed of that until three years after the incident. The erroneous medical advice, therefore, prolonged plaintiff's reasonable fear of AIDS beyond the acceptable six-month to one-year period. We therefore must determine whether that "additional" emotional distress should be attributed to the original defendants or whether the erroneous medical advice constituted an intervening cause that was not reasonably foreseeable at the time of the original negligence. Essentially, we must determine the extent to which the bad advice can be recognized as a part of the original defendants' duty of care, the breach of which constituted, as a matter of law, a proximate cause of plaintiff's continuing emotional distress.

The overriding principle governing the determination of a duty is the general obligation to avoid foreseeable harm to others. *Carvalho v. Toll Bros. & Developers*, 143 *N.J.* 565, 572, 675 *A.*2d 209 (1996). However, "[a]lthough a foreseeable risk is the indispensable cornerstone of any formulation of a duty of care, not all foreseeable risks give rise to duties." *Dunphy, supra*, 136 *N.J.* at 108, 642 *A.*2d 372.

Traditionally, our courts have held that an initial tortfeasor is liable for the results of the medical treatment of an injured victim. *See Ciluffo v. Middlesex General Hosp.,* 146 *N.J.Super.* 476, 482, 370 *A.*2d 57 (App.Div.1977) (an initial tortfeasor is potentially liable for all natural and proximate injuries that flow from initial tort, including the consequences of medical treatment); *Knutsen v. Brown,* 96 *N.J.Super.* 229, 235, 232 *A.*2d 833 (App.Div.1967) (stating that where a person has suffered personal injury by reason of another's negligence, the tortfeasor is liable for any additional harm and expense caused the injured person by the negligence, mistake, or lack of skill of the attending physician or surgeon); *see* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 44, at 308 (5th ed.1984).

 The circumstances in this case, however, militate against holding the initial tortfeasors liable for the consequences of the subsequent incorrect medical advice given to plaintiff. Our adoption of the enhanced reasonableness standard in respect of causation is based in large part on the policy consideration that ignorance concerning HIV and AIDS ought to be discouraged to the greatest extent possible through the tort law. *See* discussion *supra* at 243–245, 696 *A.*2d at 19–20. That determination is inconsistent with the imputation to the original tortfeasors of the foreseeability that the emotional distress of a claimant fearing she had contracted AIDS could be prolonged and exacerbated by incorrect information from a medical professional. *Accord Niemiera v. Schneider,* 114 *N.J.* 550, 559, 555 *A.*2d 1112 (1989) (holding that, under the "learned intermediary" rule, pharmaceutical manufacturers discharge their duty to warn the ultimate user of prescription drugs by supplying physicians with information about the drug's dangerous propensities, because it is expected that the physician acting as the intermediary between the manufacturer and the consumer will give correct medical advice); *Strumph v. Schering Corp.,* 256 *N.J.Super.* 309, 606 *A.*2d 1140 (App.Div.1992) (same). To recognize such foreseeability as a basis for defining the duty of care and proximate cause would itself encourage

medical ignorance and confusion surrounding the AIDS epidemic. *See* Shahvari, *supra,* 67 *Temp. L.Rev.* at 803 (stating that to contain the spread of AIDS effectively, courts have a responsibility to ensure the accurate circulation of information about the disease). The information allegedly provided by Dr. DeMasi—that plaintiff needed to be tested for the presence of HIV for seven to ten years—was beyond the pale of generally accepted medical evidence regarding the effectiveness of HIV testing and ought not, as a matter of law, be deemed to be reasonably foreseeable by other health-care professionals.[2] Thus, the emotional distress attributable to Dr. DeMasi's bad advice is not the kind of foreseeable risk that serves to define both the duty of care and legal proximate cause that should be attributed to the conduct of the original defendants. Consequently, plaintiff's damages based on the emotional distress arising from her fear of contracting AIDS, proximately caused by defendants' negligence as determined by the standard of enhanced reasonableness, does not include that emotional distress that is attributable to Dr. DeMasi.

IV

The judgment of the Appellate Division reversing the summary judgment in favor of defendants is affirmed. The judgment of the Appellate Division remanding the matter is modified in accordance with this opinion.

*For modification and affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

---

[2] In light of the fact that the medical profession's understanding of AIDS is constantly evolving, we do not intend by this opinion to endorse causes of action in emotional distress against doctors who proffer "conservative" advice to a possibly exposed patient. Rather, we recognize that the medical advice offered in this case constitutes advice that falls far outside the parameters of medically accepted information in respect of the incubation period.