**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 18, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 18, 2024

*Erin Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| M.N. and G.T., individually and on behalf of all others similarly situated, | ) ) ) | |
| Petitioners, | ) ) | No. 101537-2 |
| A.B. and W.N., individually and on behalf of all others similarly situated, | ) ) ) ) | En Banc |
| Plaintiffs, | ) ) | Filed: January 18, 2024 |
| v. | ) ) | |
| MULTICARE HEALTH SYSTEM, INC., a Washington corporation, | ) ) ) | |
| Respondent. | ) ) ) | |

OWENS, J.—A nurse employed by MultiCare Health System, Cora Weberg (Nurse Weberg), improperly diverted injectable narcotics for her own use. She infected some emergency department patients with hepatitis C and may have exposed many more. MultiCare notified all patients who received injectable narcotics while Nurse Weberg was on duty that they were potentially exposed. MultiCare encouraged these patients to have their blood tested for hepatitis C, hepatitis B, and HIV (human

immunodeficiency virus). As a result of these tests, MultiCare determined that only patients assigned to Nurse Weberg were actually at risk.

The patients brought a class action suit. They claim MultiCare failed to meet the accepted standard of care in supervising and hiring Nurse Weberg. The trial court divided the class into two groups: those who were assigned to Nurse Weberg and those who were not. It then dismissed the claims of the second group. The trial court ruled that legal causation was not satisfied because Nurse Weberg did not directly treat these patients. The Court of Appeals affirmed. We reverse both courts and hold that legal causation is satisfied. Both classes can proceed with their chapter 7.70 RCW claims.

FACTS AND PROCEDURAL HISTORY

MultiCare Health System operates Good Samaritan Hospital in Puyallup. Clerk's Papers (CP) at 1-2. In 2018, two patients who had previously received care at Good Samaritan tested positive for hepatitis C, despite not having any risk factors for the disease. CP at 84. Both patients had received intravenous injections of narcotics from the same nurse—Nurse Weberg—in the hospital's emergency department. CP at 143. Nurse Weberg was suspected of diverting drugs for her own use. CP at 110. Drug diversion is a known problem in health care settings. CP at 520-32. Hospitals usually develop policies and procedures to track drugs at risk of being diverted and the personnel administering them. *Id.* The parties do not contest that Weberg committed misconduct and likely caused the hepatitis C outbreak. CP at 143.

After learning of Nurse Weberg's misconduct, MultiCare sent a letter to all 2,762 patients who received injectable narcotics in Good Samaritan's emergency department while Nurse Weberg was on duty. CP at 462-63, 349. The letter stated, "an employee in the Emergency Department may have exposed at least two patients to Hepatitis C virus, causing them to become infected." CP at 462. It offered complimentary blood testing for hepatitis C, hepatitis B, and HIV to all letter recipients and cautioned, "The only way to be certain you were not infected is to have your blood tested." *Id.* The letter also stated that patients may need to undergo additional testing within six months to rule out infection. *Id.*

MultiCare sent the letter both to patients who were assigned to Nurse Weberg and those who were not. CP at 462-63, 465-66, 468-69. Tacoma-Pierce County Health Department (TPCHD) and the United States Centers for Disease Control and Prevention (CDC) recommended testing for both groups of patients. CP at 75, 104. The hospital internally designated patients assigned to Weberg as "high risk" and the others as "low risk." CP at 364-66. However, it sent the same letter to both groups. CP at 462-66.

Overall, 1,863 people had their blood tested. CP at 85. The tests identified 11 more cases of hepatitis C. *Id.* All 13 patients who tested positive for hepatitis C had been assigned to Nurse Weberg during their emergency room (ER) visit. CP at 365-66.

3

*Procedural History*

M.N., A.B., G.T., and W.N. brought this class action on behalf of all persons who received the notification letter from MultiCare. CP at 7, 27-28. They alleged negligent supervision and hiring under a theory of corporate negligence and under chapter 7.70 RCW. CP at 298. Chapter 7.70 RCW provides a cause of action for injuries resulting "from the failure of a health care provider to follow the accepted standard of care." RCW 7.70.030(1). The class claimed damages for "severe emotional and mental anguish" and for "medical care, treatment, and services." CP at 2, 12. We note that not all class members had their blood tested, and therefore some patients experienced only emotional harm.

The trial court certified two classes of patients. The "Weberg Treatment Class" consists of the 208 patients assigned to Nurse Weberg. CP at 322. The "General Treatment Class" consists of the 2,554 patients who were not assigned to Nurse Weberg. *Id.* Neither class contains individuals who were infected with the strain of hepatitis C linked to Weberg. CP at 664 n.1.

MultiCare moved to dismiss the General Treatment Class's claims on a motion for summary judgment. CP at 325-45. It argued that the General Treatment Class failed to prove legal causation. CP at 340. MultiCare said that because Nurse Weberg did not treat this group, they did not experience harm "caused by" a negligently supervised employee. *Id.* (emphasis omitted). Furthermore, it argued that

this group could not prove they were ever at risk of exposure to the virus. CP at 336.

MultiCare urged the court to adopt a rule that would require proof of actual exposure

to a disease before plaintiffs can recover. CP at 332. The trial court granted

MultiCare's motion, reasoning that imposing liability without actual exposure could

chill a hospital's investigation of disease outbreaks. CP at 724. It dismissed the

General Treatment Class's claims. CP at 660-61.

Division II affirmed the trial court's dismissal in a divided opinion. The

majority held that the General Treatment Class did not establish legal causation. *M.N.*

*v. MultiCare Health Sys., Inc.*, 23 Wn. App. 2d 558, 568, 519 P.3d 932 (2022). It held

that public policy weighed in favor of limiting liability when a hospital responds to a

disease outbreak. *Id.* This court accepted review. *M.N. v. MultiCare Health Sys.,*

*Inc.*, 1 Wn.3d 1001 (2023).

ISSUES

(1)    Do the General Treatment Class's alleged injuries arise "as the result of

health care" as required for a chapter 7.70 RCW claim?

(2)    Is legal causation met when a hospital's negligent supervision and hiring

potentially exposes patients to a bloodborne pathogen, inducing fear and requiring

blood testing?

ANALYSIS

This court is reviewing an order granting summary judgment and considers questions of law de novo. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).

1. *The General Treatment Class's Alleged Injuries Arise "as the Result of Health Care" as Required for a Chapter 7.70 RCW Claim*

MultiCare argues that the General Treatment Class does not have a claim under chapter 7.70 RCW because their injuries do not arise as the result of health care. MultiCare Health Sys., Inc.'s Suppl. Br. (Resp't's Suppl. Br.) at 26. It points out that they were never treated by Nurse Weberg and Nurse Weberg is the one who committed misconduct. *Id*. However, the General Treatment Class does not argue they were harmed by Weberg's negligence but by the hospital's negligence in supervising and hiring her.

Chapter 7.70 RCW governs "all civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for injury occurring as a result of health care." RCW 7.70.010. The General Treatment Class's claim falls under RCW 7.70.030(1) as it argues that MultiCare failed "to follow the accepted standard of care." To prevail, the General Treatment Class must prove that MultiCare failed to exercise the degree of care, skill, and learning of a reasonably prudent health care provider and that such failure proximately caused their injury. RCW 7.70.040(1).

However, for a plaintiff's claim to fall under chapter 7.70 RCW, the injury must occur "as a result of health care." RCW 7.70.010.

Chapter 7.70 RCW does not define "health care," but Washington courts have defined it as "'the process in which [a physician is] utilizing the skills which he had been taught in examining, diagnosing, treating, or caring for the plaintiff as his patient.'" *Sherman v. Kissinger*, 146 Wn. App. 855, 867, 195 P.3d 539 (2008) (alteration in original) (quoting *Branom v. State*, 94 Wn. App. 964, 969-70, 974 P.2d 335 (1999)).

Individuals and entities beyond physicians can provide health care. Chapter 7.70 RCW defines "health care provider" as "[a] person licensed by this state to provide health care or related services." RCW 7.70.020(1). "Health care provider" also includes nonhuman actors, such as a "hospital," "facility, or institution" that employs a person providing health care. RCW 7.70.020(3).

Thus, "health care" under chapter 7.70 RCW is the process by which any health care provider uses the skills they have been taught to examine, diagnose, treat, or care for the plaintiff as their patient.

We hold that the General Treatment Class's injuries arise as a result of health care, allowing their claim under chapter 7.70 RCW to proceed. Every member of the General Treatment Class was a patient in Good Samaritan's ER and received injections from a health care provider as part of their treatment. These injections were

part of the process of being treated or cared for by a health care provider who was using the skills they had been taught. The potential exposure to hepatitis C results from MultiCare's alleged failure to follow the accepted standard of care in the process of providing this health care. Thus, the General Treatment Class has a chapter 7.70 RCW claim even without evidence they were treated by Weberg.

### 2. *Legal Causation Is Satisfied*

The General Treatment Class brings claims under chapter 7.70 RCW and the common law doctrine of corporate negligence. Both causes of action have a proximate cause requirement. Under chapter 7.70 RCW, a plaintiff must prove that a health care provider's negligence was the "proximate cause of the injury complained of." RCW 7.70.040(1)(b). Corporate negligence claims similarly require a breach of care that proximately caused plaintiff's injury. *Douglas v. Freeman*, 117 Wn.2d 242, 248, 814 P.2d 1160 (1991). "Proximate cause has two elements: cause in fact and legal cause." *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 436-37, 378 P.3d 162 (2016).

Legal causation "involves a determination of whether liability *should* attach as a matter of law given the existence of cause in fact." *Hartley v. State*, 103 Wn.2d 768, 779, 698 P.2d 77 (1985). Courts evaluate whether "the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478-79, 951 P.2d 749 (1998). Legal causation is "grounded in policy determinations as to how far the

consequences of a defendant's acts should extend." *Id.* at 478. Courts weigh "'mixed considerations of logic, common sense, justice, policy, and precedent.'" *Id.* at 479 (internal quotation marks omitted) (quoting *King v. City of Seattle*, 84 Wn.2d 239, 250, 525 P.2d 228 (1974)).

The Court of Appeals did not find legal causation in this case. *M.N. v. MultiCare*, 23 Wn. App. 2d at 568. It concluded that there is no "bright-line rule" governing legal causation in fear of disease transmission cases. *Id.* at 566. Therefore, it decided "[a]s a policy matter" not to impose liability on MultiCare. *Id.* at 567. We reverse the Court of Appeals for three reasons. First, chapter 7.70 RCW allows claims for purely emotional damages. Therefore, the fact that some class members suffered only emotional harm does not preclude their chapter 7.70 RCW claim. Second, the General Treatment Class's harm is directly caused by the hospital's conduct, not from being treated by Nurse Weberg or receiving the notification letter. And third, public policy favors finding legal causation when a hospital's negligence leads to an objectively reasonable fear of contracting a disease through a medically recognized means of transmission.

A. *While Washington Law Often Disfavors Damages for Purely Emotional Harm, Chapter 7.70 RCW Does Not Impose Such a Restriction*

MultiCare argues that because the General Treatment Class's damages are largely emotional, their interest in recovery is outweighed by other policy considerations. Resp't's Suppl. Br. at 10-11. However, chapter 7.70 RCW does not distinguish between emotional and physical harms. Purely emotional damages can be a valid basis for a chapter 7.70 RCW claim. Therefore, the fact that some class members did not undergo blood testing and suffered only emotional harms should not preclude them from bringing a claim as a matter of law.

Washington courts have recognized the need to limit claims for purely emotional damages under some causes of action. Courts were concerned that "feigned claims of emotional distress would lead to 'intolerable and interminable litigation.'" *Bylsma v. Burger King Corp.*, 176 Wn.2d 555, 560, 293 P.3d 1168 (2013) (internal quotation marks omitted) (quoting *Corcoran v. Postal Tel.-Cable Co.*, 80 Wash. 570, 579, 142 P. 29 (1914)). Therefore, we established an "objective symptomatology" requirement for negligent infliction of emotional distress (NIED) claims. *Hunsley v. Giard*, 87 Wn.2d 424, 436, 553 P.2d 1096 (1976). NIED claimants may recover for purely emotional harm, but it must manifest in "physical symptoms evidencing and resulting from the emotional distress." *Id.* at 433

However, the objective symptomatology requirement applies only to NIED claims. It does not apply to claims of intentional infliction of emotional distress, *Kloepfel v. Bokor*, 149 Wn.2d 192, 66 P.3d 630 (2003), attorney negligence, *Schmidt v. Coogan*, 181 Wn.2d 661, 335 P.3d 424 (2014) (plurality opinion), or wrongful adoption, *Price v. State*, 114 Wn. App. 65, 57 P.3d 639 (2002), among others.

Most importantly, there is no objective symptomatology requirement under chapter 7.70 RCW. In *Berger v. Sonneland*, this court addressed this question directly. 144 Wn.2d 91, 26 P.3d 257 (2001) *reversing* 101 Wn. App. 141, 1 P.3d 1187 (2000). In *Berger*, a woman sued her doctor under chapter 7.70 RCW for negligently disclosing her confidential medical history. *Id.* at 95-96. We held that plaintiffs can recover for purely emotional damages under chapter 7.70 RCW without any proof of objective symptomatology. *Id.* at 113. We agreed with the lower court that chapter 7.70 RCW claims are already limited, as they must arise from health care and must fit within the statute's narrow framework. *Berger*, 101 Wn. App. at 158. Therefore, an objective symptomatology requirement is unnecessary.

The General Treatment Class may pursue a claim for purely emotional damages under chapter 7.70 RCW. Therefore, the fact that some class members suffered purely emotional damages is irrelevant in determining legal causation in this case.

11

B. *The General Treatment Class's Harm Was Directly Caused by the Alleged Negligence of the Hospital in Supervising and Hiring Employees*

Because Nurse Weberg did not directly treat the General Treatment Class, MultiCare argues other policy concerns outweigh the General Treatment Class's fear of disease transmission. Resp't's Suppl. Br. at 16. This is irrelevant to the issue of legal causation because the General Treatment Class's claim is not based on direct treatment by Nurse Weberg. Instead, the General Treatment Class has demonstrated that they reasonably feared infection based on their treatment in a negligently managed emergency department.

The General Treatment Class provided several bases for this fear. Nurse Weberg kept inconsistent records about what patients she cared for and what drugs she administered. CP at 103-12, 613-18. A patient in a busy ER may be treated by whatever nurse is available, whether or not they are assigned to that patient. CP at 573. Health workers who divert drugs may contaminate a generally available supply of syringes that can then infect patients they did not directly treat. CP at 617. *See also Exeter Hosp., Inc. v. Kwiatkowski*, No. 14-CV-09-PB, 2014 WL 1795055 (D.N.H. May 6, 2014) (doctor infected patients with hepatitis C by placing contaminated syringes in general distribution). Finally, MultiCare, TPCHD, and the CDC all believed the General Treatment Class was at risk of contracting a bloodborne disease

12

regardless of whether they were treated by Weberg.  This is why they recommended testing to this group.  CP at 104, 462.

No plaintiffs in this suit—whether in the Weberg Class or the General Treatment Class—base their claim for damages on treatment by Nurse Weberg. Patients were unaware that Nurse Weberg was responsible for spreading the virus when they learned of the outbreak.  MultiCare's letter stated only that "an employee in the Emergency Department" may have exposed patients to hepatitis C.  CP at 468.  The same notification letter was sent to all at-risk patients, whether they were treated by Nurse Weberg or not.  Instead, the fear arose from a real risk of exposure to bloodborne pathogens, as determined by public health experts, not from being directly treated by Nurse Weberg.  Thus, the fact that Nurse Weberg did not treat the General Treatment Class is not relevant to legal causation.

MultiCare also suggests that the General Treatment Class's distress was "'caused by MultiCare's notification letter.'"  Resp't's Suppl. Br. at 30 (quoting *M.N. v. MultiCare,* 23 Wn. App. 2d at 568).  It argues that sending the notification letter was nonnegligent, therefore the General Treatment Class's distress upon receiving the letter is too remote from any actual negligence and MultiCare should not be held liable.  Resp't's Suppl. Br. at 8.

Claims for purely emotional harms often arise from a plaintiff's *knowing* or *learning* of misconduct. However, it is irrelevant how they learn of the misconduct. The content of the notification and the underlying negligence causes the harm. For example, in *Bylsma*, a police officer suffered emotional harm after learning that an employee had spit in his burger. 176 Wn.2d at 557. Although he discovered the spit by observing it and touching it with his hand, the manner of discovery does not matter. *Id.* If his meal had been delivered with a note telling him there was spit in his burger, he would have had an equally strong claim. The underlying negligent conduct harmed him, not the manner of discovery.

In this case, there is perfect overlap between the injured group and the group that received MultiCare's notification letter. But this does not mean that the letter *caused* the harm. Rather, both classes were harmed by exposure to a high risk of infection in MultiCare's emergency department. Laudably, MultiCare chose to notify everyone in this at-risk group. But even if the class had learned of their risk of exposure from the CDC or the local health department rather than from MultiCare, they would have had an equally strong claim.

MultiCare and the Court of Appeals improperly focused on the notification letter. The General Treatment Class *learned* of the outbreak through the letter but was harmed by the allegedly negligent acts revealed in

14

the letter. If MultiCare had properly hired, supervised, and monitored potential drug diversion by employees, notification likely would not have been necessary. The General Treatment Class's damages are not too remote from MultiCare's acts to impose liability.

      C. *Public Policy Favors Finding Legal Causation when There Is an Objectively Reasonable Fear of Disease, Transmitted by Medically Recognized Means, and Damages within the Window of Anxiety*

Legal causation is largely a policy question, and there are strong policy considerations on both sides of this issue.

General principles of tort law recognize that tortfeasors should be held liable for the harm they cause. When someone is harmed by another, it is only fair that the injured party is compensated by the wrongdoer. *Seattle-First Nat'l Bank v. Shoreline Concrete Co.*, 91 Wn.2d 230, 236, 588 P.2d 1308 (1978). Additionally, imposing liability on wrongdoers has a deterrent effect. *Barr v. Interbay Citizens Bank of Tampa*, 96 Wn.2d 692, 699, 635 P.2d 441 (1981). If a hospital knows it will be held financially accountable for its negligence, it will have a strong incentive to ensure it meets the standard of care. As the General Treatment Class points out, a hospital is in a much better position than patients to ensure that its employees are providing safe and competent care. Suppl. Br. of Pet'rs at 21.

However, strong policy considerations also weigh against holding a hospital liable in disease transmission cases. As TPCHD notes in its amicus brief, "health departments across Washington rely on the voluntary actions of medical institutions" to communicate with patients in the event of a disease outbreak. Br. of Amicus Curiae TPCHD at 8. While Washington law requires hospitals to communicate with local health departments, it does not require a hospital to notify potentially infected patients. *Id*. at 16. TPCHD argues that holding MultiCare liable to the General Treatment Class "risks creating a perverse incentive for medical institutions to withhold . . . notice in future potential outbreaks." *Id.* at 15.

Both sides raise valid concerns. This court has yet to weigh these policy concerns in a case involving fear of disease transmission. Other jurisdictions to consider this issue have adopted legal causation standards of two general types: (1) an objective "actual exposure" test or (2) a "reasonableness of fear" test.

An "actual exposure" test forces plaintiffs to "demonstrate an exposure to a disease causing agent." *Burk v. Sage Prods., Inc.,* 747 F. Supp. 285, 287 (E.D. Pa. 1990). One court interprets the test to require both that a disease "was present in the alleged disease-transmitting agent . . . and that a medically sound channel of transmission existed." *Madrid v. Lincoln County Med. Ctr.,* 1996-NMSC-049, ¶ 20, 122 N.M. 269, 275, 923 P.2d 1154. This objective standard ensures that public

misconceptions about how a disease is spread do not lead to "frivolous litigation." *Pendergist v. Pendergrass*, 961 S.W.2d 919, 926 (Mo. App. 1998). This was a particular concern during the HIV/AIDS (acquired immune deficiency syndrome) epidemic, when public misconceptions about the virus and its spread led to "'unreasonable suspicion or general paranoia.'" *Id*. (quoting *Brzoska v. Olson*, 668 A.2d 1355, 1363 (Del. 1995)).

However, proving actual exposure to a disease can be impossible in some cases and may be an unjust bar to recovery. *Faya v. Almaraz*, 329 Md. 435, 455, 620 A.2d 327 (1993). For example, a plaintiff's claim would fail if a syringe or other disease-transmitting agent is discarded before being tested. Therefore, some jurisdictions require plaintiffs to show only a "medically sound channel of transmission" of a disease. *Madrid*, 122 N.M. at 278. This allows recovery for reasonable fears of exposure even when evidence is lost or unavailable. It also limits claims when fear of contracting a disease is not based on any scientifically recognized means of transmission.

Alternatively, jurisdictions that apply a "reasonableness of fear" test focus on whether a plaintiff's fear of contracting a disease was "reasonable." *Williamson v. Waldman*, 150 N.J. 232, 242, 696 A.2d 14 (1997). A reasonableness test supports general tort principles of deterrence and compensation by making recovery easier. These jurisdictions often include an additional requirement to limit meritless claims.

17

For example, New York courts consider one or more of the following factors to determine whether a plaintiff's fear of developing AIDS is reasonable: the channel of transmission, whether HIV was present when the transmission occurred, and the results of an HIV antibody test. *Brown v. N.Y.C. Health & Hosps. Corp.*, 648 N.Y.S.2d 880, 886, 225 A.D.2d 36 (1996). New Jersey defines "reasonable" to coincide "with then-current, accurate, and generally available public information about the causes and transmission of [the disease]." *Williamson*, 150 N.J. at 249. Other courts consider emotional distress reasonable only if it occurs within "the window of anxiety." *Williamson*, 150 N.J. at 250; *Faya*, 329 Md. at 456. This is the period between when a person learns of the exposure and when they know or should know that they are not infected. This limits damages to a circumscribed window, even if a plaintiff refuses testing or suffers anxiety in spite of a negative test result.

MultiCare points out that the majority of jurisdictions adopted the "actual exposure" requirement. However, most of the cases surveyed arose in the context of an NIED claim. Because NIED claims often have a physical impact requirement, many courts favor the "actual exposure" test because it contains an objective element analogous to the NIED physical impact test. *See Carroll v. Sisters of Saint Francis Health Servs., Inc.*, 868 S.W.2d 585, 594 (Tenn. 1993) (adopting actual exposure requirement because it is consistent with the "existent injury" requirement for NIED claims); *see also Madrid* 122 N.M. 269 (declining to adopt the actual exposure test in

18

part because New Mexico no longer requires proof of physical manifestation of injury in NIED claims). This case arises under chapter 7.70 RCW and not NIED. Therefore, a physical impact requirement is unnecessary.

We reject the cautious "actual exposure" test favored in NIED cases. However, a pure "reasonableness" standard lacks guardrails and could lead to excessive liability if the public lacks information about a disease. Therefore, the test we adopt must link reasonableness to a scientific understanding of how a particular disease is spread and who is at risk of infection. Additionally, plaintiffs should be able to recover emotional distress damages only for the period between discovery of the potential exposure and when it is clear that they have not been infected.

Therefore, this court adopts a new test for legal causation for chapter 7.70 RCW claims that involve fear of disease transmission. Plaintiffs must establish (1) an objectively reasonable fear of having contracted a disease (2) through a medically recognized means of transmission (3) and damages that occur within the window of anxiety. This test weeds out frivolous litigation and accounts for public misinformation while still holding tortfeasors responsible for the consequences of their negligence.

Applying the test to this case, we hold that the General Treatment Class has established legal causation in their chapter 7.70 RCW claim. The General Treatment Class has shown that class members reasonably feared contracting hepatitis C when

19

they learned of the alleged negligence. They have also demonstrated a medically recognized means of transmission: intravenous injections of potentially contaminated drugs. Under this test, the General Treatment Class does not need to prove the injections they received were actually infected with a disease. Finally, the General Treatment Class may recover damages only for the window of anxiety, which is the period between when a person learns of the exposure and when they know or should know that they are not infected.

CONCLUSION

We hold that the General Treatment Class properly brought this claim under chapter 7.70 RCW because their injuries arise as a result of heath care. We adopt a new test for legal causation in chapter 7.70 RCW claims involving fear of disease transmission. Plaintiffs must establish (1) an objectively reasonable fear of having contracted a disease (2) through a medically recognized means of transmission (3) and damages that occur within the "window of anxiety." The General Treatment Class has established legal causation for their chapter 7.70 RCW claim. We leave for the courts below to explore if and how this affects legal causation in any corporate negligence claims that remain in this case.

The Court of Appeals' decision is reversed as to the General Treatment Class's chapter 7.70 RCW claim. The case is remanded to the Court of Appeals for proceedings consistent with this opinion.

_____
Owens, J.


WE CONCUR:


_____
Johnson, J.

_____
Stephens, J.

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Hazelrigg, J.P.T.

No. 101537-2

GONZÁLEZ, C.J. (dissenting)—The plaintiffs before us went to Good Samaritan Hospital for emergency care.  While they were there, a nurse exposed some of her patients to a deadly disease.  Once a cluster of hepatitis outbreaks was detected, the hospital and public health workers made the responsible choice to inform all those who might be at risk and to offer them free blood tests.

As results came in, it became clear that only the nurse's own patients were at risk.  But these plaintiffs, who were not the nurse's patients, had to live for months not knowing if they had been exposed, if they would need difficult and expensive treatment, if they posed a risk to their loved ones, or if their lives would be cut short.  That is an undeniable injury.

But not all injuries have remedies at law.  Whether these plaintiffs do is governed by chapter 7.70 RCW.  In that act, the legislature has limited compensable injuries resulting from health care to three categories.  RCW

*M.N. & G.T. v MultiCare Health System, Inc.* No. 101537-2 (González, C.J., dissenting)

7.70.030. The only category that possibly applies here is the failure to meet the standard of care. RCW 7.70.030(1).[1]

None of the plaintiffs before us were treated, exposed, or infected by the nurse. They were never at risk from her. The plaintiffs' real injury was their temporary fear that they were injured. While that fear is understandable, it is not an injury for which chapter 7.70 RCW gives a remedy.

Plaintiffs who got blood tests may have suffered a compensable injury under chapter 7.70 RCW. Blood tests are inconvenient, highly invasive, and can cause pain and anxiety. But even if a voluntary blood test under these circumstances could be considered an injury, whether that injury is potentially compensable turns on whether the hospital's failure to meet the standard of care was a legal cause of the plaintiffs' injuries. Arguably, the hiring, training, and supervision of the nurse did not meet the standard of care and was a cause in fact of the blood test. But to be actionable, the hospital's failure to meet the standard of care must also be a legal cause of any injury. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998) (citing *King v. City of Seattle*, 84 Wn.2d 239, 249, 525 P.2d 228 (1974)).

---

[1]Under chapter 7.70 RCW, plaintiffs may also seek recovery for unfulfilled promises that an injury would not occur or injuries resulting from health care delivered without consent. RCW 7.70.030(2), (3). These categories are not before us.

*M.N. & G.T. v MultiCare Health System, Inc.* No. 101537-2 (González, C.J., dissenting)

"Legal cause 'is grounded in policy determinations as to how far the consequences of a defendant's acts should extend.'" *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 437, 378 P.3d 162 (2016) (quoting *Crowe v. Gaston*, 134 Wn.2d 509, 518, 951 P.2d 1118 (1998)). Even if the hospital was negligent, the blood test was the direct result of the hospital taking responsible action. The Tacoma-Pierce County Public Health Department describes the hospital's actions as the "model response to a potential outbreak of communicable disease. Had [the hospital] refused to send the notices at issue here, public health would have suffered." Br. of Amicus Curiae Tacoma-Pierce County Pub. Health Dep't at 5. The hospital's actions also followed public policies embraced by the Washington State Legislature and our evidence rules. *See* RCW 5.64.010(1) ("In any civil action against a health care provider for personal injuries which is based upon alleged professional negligence . . . evidence of furnishing or offering or promising to pay medical, hospital, or similar expenses occasioned by an injury is not admissible."); ER 407 (subsequent remedial measures not evidence of negligence or culpable conduct). Given these strong policies in favor of disclosure and remedial action, under the statute, the hospital's actions were not the proximate cause of an injury for which the law gives a remedy.

3

I would affirm the courts below.  Accordingly, I respectfully dissent.

González, C.J.

Gordon McCloud, J.

Whitener, J.